# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-20729

United States Court of Appeals
Fifth Circuit

**FILED**

November 14, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellant

v.

ERIC BEVERLY,

Defendant - Appellee

Appeals from the United States District Court
for the Southern District of Texas

Before CLEMENT, ELROD, and DUNCAN, Circuit Judges.

STUART KYLE DUNCAN, Circuit Judge:

Armed with a court order but no warrant, FBI agents obtained historical cell-site location information ("CSLI") for the phone of a suspected serial bank robber, Eric Beverly. Before the government could use that information at trial (to show that Beverly's phone was at or near the banks at the time they were robbed) the Supreme Court held in *Carpenter v. United States* that if the government wants CSLI it needs a valid search warrant. 138 S. Ct. 2206, 2221 (2018). So, on the same day *Carpenter* was decided, federal prosecutors applied for—and got—a search warrant for the CSLI they already had (plus quite a bit more). Beverly moved to suppress the CSLI and other related evidence, claiming the warrant was obtained in bad faith. The district court agreed,

No. 18-20729

suppressing the CSLI and declaring the court order and warrant void. The government appeals that order. Because the district court should have applied various strands of the good-faith exception to the warrant requirement, we reverse.

## I.

In the summer of 2014, surveillance cameras across the Houston area began capturing a string of armed bank robberies. The robberies consistently involved a group of masked individuals, two or three of whom would enter a bank, hold up the lobby, and empty the teller drawers—all in less than sixty seconds—before driving off in a black Dodge Ram pickup with chrome nerf bars[1] and two bullet holes in the back. Sometimes other vehicles were also used, including a silver Infiniti SUV. During the holdups, the robbers would communicate via three-way cell phone calls. They never entered the bank vaults, but instead took money only from teller drawers. Still, the robbers managed to steal as much as $20,000–$30,000 from some of the banks, all of which were FDIC insured.

The government finally caught a break in the investigation on January 24, 2015, when agents lifted a palm print from a spot where one of the robbers had vaulted over a teller counter (as recorded in the security footage). The FBI matched the print to Jeremy Davis, who was arrested on May 5, 2015, while driving the black Dodge Ram seen in the videos. The truck turned out to be registered to Davis's mother. Davis confessed, admitting participation in twenty bank robberies and three jewelry store smash-and-grabs. He also named five of his accomplices, one of whom was Eric Beverly. According to Davis, Beverly was responsible for handing out the guns, masks, and gloves

---

[1] Nerf bars are tubular running boards that attach to the sides of pickup trucks.

before each robbery, and Beverly along with another accomplice did most of the planning.

Investigators later tied Beverly to the silver Infiniti SUV seen on some of the surveillance tapes. They learned that Beverly had bought the vehicle from a Craigslist seller in a Target parking lot for $9,000 but had never changed over the registration. The government also interviewed at least two people who indicated that Davis and Beverly were friends.

Meanwhile, on May 28, 2015, the government applied for an order pursuant to the Stored Communications Act, 18 U.S.C. § 2703(d), directing T-Mobile to provide subscriber information, toll records, and historical CSLI for Davis's iPhone.[2] A federal magistrate judge issued the requested order that same day. Armed with the order, the government did not seek a warrant for Davis's historical CSLI. The government subsequently associated four other phone numbers with Davis's co-conspirators and submitted a second § 2703(d) application requesting subscriber information, toll records, and historical CSLI for those phone numbers. The same magistrate judge issued an order for the additional phone numbers on July 8, 2015, requiring T-Mobile to provide CSLI for the period between January 24, 2015 and May 5, 2015. Subscriber

---

[2] "Subscriber information" includes the name, address, and other identifying information for the person to whom the phone number is registered. "Toll records," also known as call detail records, are records of calls placed and received on the subscriber's account (including the time, duration, and phone number dialed, but not the content of the calls). "Historical CSLI" consists of a series of time-stamped records created as a mobile phone continuously pings nearby cell towers, pinpointing the location of the phone within a relatively small area (currently a radius of about 50 meters). *See Carpenter*, 138 S. Ct. at 2211, 2019. CSLI should not be confused with GPS data, which is far more precise location information derived by triangulation between the phone and various satellites. Even in 2015, the government would have likely needed a search warrant to obtain GPS data from Beverly's phone, assuming such data was available. *See United States v. Jones*, 565 U.S. 400 (2012) (holding that attaching a GPS device to a suspect's car constituted a search under the Fourth Amendment).

information provided by T-Mobile confirmed that one of the numbers was registered to Beverly.

Sometime in August 2015, Beverly was arrested for an unrelated probation violation and placed in a Texas state jail. On May 26, 2016, while Beverly was still incarcerated in the state facility, he was charged by federal indictment with multiple counts of conspiracy, armed bank robbery, attempted armed bank robbery, and brandishing a firearm during a crime of violence. Beverly was transferred into federal custody on June 1, 2016.

On June 22, 2018, less than two months before the start of Beverly's federal trial, the Supreme Court handed down its decision in *Carpenter*, in which the Court held that obtaining CSLI constituted a "search" under the Fourth Amendment and therefore required a valid warrant supported by probable cause. 138 S. Ct. at 2220–21. Out of "an abundance of caution" the government applied for and obtained a search warrant that very day for Beverly's cell phone information, including historical CSLI, subscriber information, and toll records associated with his T-Mobile account. Notably, the government's warrant application sought historical CSLI for the period extending from August 25, 2014 until May 2, 2015—more than double the amount of time covered by the previous § 2703(d) order. Although the application omitted the fact that the government already possessed some of the information to be searched, the issuing magistrate judge was apparently aware of *Carpenter* and agreed that obtaining a search warrant was a "good idea."

In response to *Carpenter* and the government's contemporaneous search warrant, Beverly moved to suppress the warrant and the "numbers, cell site information, and names" gathered as fruit of the two § 2703(d) orders. The district court granted the motion on October 25, 2018, voiding the "warrant and the order," and suppressing the "cell-site location data and all evidence that has been derived from them . . . as infected by the same virus." The

No. 18-20729

government timely appealed. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3731. *See United States v. Wise*, 877 F.3d 209, 215 (5th Cir. 2017).

## II.

On appeal of a motion to suppress, legal conclusions are reviewed *de novo* while factual findings are reviewed for clear error. *United States v. Mendez*, 885 F.3d 899, 907 (5th Cir. 2018). "A factual finding 'is clearly erroneous if we are left with a definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Hernandez*, 670 F.3d 616, 620 (5th Cir. 2012)). "But when influenced by an incorrect view of the law or an incorrect application of the correct legal test, a factual determination is reviewed *de novo*." *United States v. Toussaint*, 838 F.3d 503, 507 (5th Cir. 2016) (citing *United States v. Mask*, 330 F.3d 330, 335 (5th Cir. 2003)).

"The party seeking suppression 'has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights.'" *United States v. Wallace*, 885 F.3d 806, 809 (5th Cir. 2018) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992)). Evidence is viewed in the light most favorable to the prevailing party. *Mendez*, 885 F.3d at 907.

## III.

## A.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The basic purpose of the Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter*, 138 S. Ct. at 2213 (citing *Camara v. Mun. Court of City and Cty. of San Francisco,* 387 U.S. 523, 528 (1967)). It protects against government intrusion into areas where people have

reasonable expectations of privacy. *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Katz v. United States*, 389 U.S. 347, 351 (1967). Where the government seeks to intrude upon such private spheres, it generally needs a warrant supported by probable cause. *Carpenter*, 138 S. Ct. at 2213.

"The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands . . . ." *United States v. Leon*, 468 U.S. 897, 906 (1984). The reason is that exclusion of such evidence would not cure the wrong condemned by the Amendment: the unlawful search or seizure itself. *Id.* However, courts have embraced the so-called "exclusionary rule"—a judicially created remedy that precludes the use of evidence obtained from an unconstitutional search or seizure—in order "to safeguard Fourth Amendment rights generally through its deterrent effect." *Id.* (citing *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

An exception to the exclusionary rule exists where government investigators acted with an objectively reasonable good-faith belief that their conduct was lawful. *Davis v. United States*, 564 U.S. 229, 238 (2011). This "good-faith exception" to the exclusionary rule is grounded in the observation that where official action is "pursued in complete good faith . . . the deterrence rationale loses much of its force." *Leon*, 468 U.S. at 919 (quoting *United States v. Peltier*, 422 U.S. 531, 539 (1975)); *see also United States v. Williams*, 622 F.2d 830, 840 (5th Cir. 1980) (en banc) ("[T]he exclusionary rule exists to deter willful or flagrant actions by police, not reasonable, good-faith ones.").

The good-faith exception to the exclusionary rule, first articulated over forty years ago in *Leon*, has been applied to a range of cases. *See Davis*, 564 U.S. at 238–39. In *Leon* itself, the exception was applied where police acted in reliance on a warrant that was later held to be unsupported by probable cause. *Leon*, 468 U.S. at 922. However, the Court in *Leon* recognized several

limitations on the good-faith exception. *Id.* at 923. As distilled in later cases, the good-faith exception will not apply:

(1) When the issuing magistrate was misled by information in an affidavit that the affiant knew or reasonably should have known was false;

(2) When the issuing magistrate wholly abandoned his judicial role;

(3) When the warrant affidavit is so lacking in indicia of probable cause as to render official belief in its existence unreasonable; and

(4) When the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that executing officers cannot reasonably presume it to be valid.

*United States v. Woerner*, 709 F.3d 527, 533–34 (5th Cir. 2013) (citing *United States v. Payne*, 341 F.3d 393, 399–400 (5th Cir. 2003)). For clarity and convenience, we refer—in this opinion—to the warrant-without-probable-cause strand of the good-faith exception as the "*Leon* exception."

The good-faith exception has also been applied to evidence obtained from *warrantless* searches later held to be unconstitutional. In *Illinois v. Krull*, for example, the Supreme Court applied the good-faith exception where officers had "act[ed] in objectively reasonable reliance upon a *statute* authorizing warrantless administrative searches, but where the statute [was] ultimately found to violate the Fourth Amendment." 480 U.S. 340, 342 (1987). The Court reasoned that if a "statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written." *Id.* at 350. Similarly, the Supreme Court has applied the good-faith exception to a warrantless search that complied with binding appellate precedent that was later overruled. *Davis*, 564 U.S. at 232. In *Davis*, police conducted a vehicle search in reasonable reliance on binding circuit precedent, but several years

later—while the defendant's criminal appeal was still pending—the Supreme Court held that such searches were unconstitutional. *Id.* at 239. The Court applied the good-faith exception on the ground that excluding the relevant evidence would not foster the appropriate deterrent effect. *Id.* at 241.

To distinguish it from the *Leon* exception, we refer to this strand of the good-faith exception—where a warrantless search is authorized by statute or binding precedent later ruled unconstitutional—as the "*Krull* exception."

B.

In 1986, Congress enacted the Stored Communications Act ("SCA"). 18 U.S.C. §§ 2701–2711. As amended in 1994, the SCA permits a law enforcement agency to obtain a court order compelling the disclosure of certain telecommunications records when the agency "offers specific and articulable facts showing that there are reasonable grounds to believe" that the records sought "are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). This standard, which is less stringent than the probable cause standard generally required for a search warrant, is derived from the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Perrine*, 518 F.3d 1196, 1202 (10th Cir. 2008).

In 2013, when the constitutionality of § 2703(d) was challenged in the Fifth Circuit, a divided panel held that the statute was constitutional even when applied to the disclosure of historical CSLI. *In re Application of the U.S. for Historical Cell Site Data*, 724 F.3d 600, 602 (5th Cir. 2013). The majority reasoned that CSLI records were business records of cell service providers and that, under the third-party doctrine, cell phone users did not have a reasonable expectation of privacy in those records. *Id.* at 610–12.

Eventually the same question reached the Supreme Court, which, as noted above, held on June 22, 2018 that § 2703(d) was unconstitutional. *Carpenter*, 138 S. Ct. at 2220–21. The Court determined that obtaining CSLI

8

No. 18-20729

from a wireless carrier amounts to a search under the Fourth Amendment because an individual has "a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." *Id.* at 2217. The Court rejected the argument that because CSLI was shared with and retained by wireless carriers, the request for such information amounted to "a garden-variety request for information from a third-party witness." *Id.* at 2219–20 (relying on the exhaustive, detailed nature of CSLI records and the indispensable need to carry a cell phone in modern society). The Court concluded that to acquire CSLI records "the Government must generally obtain a warrant supported by probable cause," *id.* at 2221, unless the search "falls within a specific exception to the warrant requirement." *Id.* (quoting *Riley v. California*, 573 U.S. 373, 382 (2014).

IV.

In the present appeal, the United States argues that the district court erred in suppressing Beverly's historical CSLI because it failed to apply the good-faith exception. Beverly responds that the good-faith exception does not apply because investigators acted in bad faith when they sought a warrant—the day *Carpenter* was decided—for CSLI they already had. Confusion arises because each party uses the term "good-faith exception" to refer to a different strand of the exception, without realizing that the other side is operating on a different wavelength. The United States approaches the case under the *Krull* exception and therefore focuses its good-faith arguments on the pre-*Carpenter* warrantless § 2703(d) order. Beverly treats the case under the *Leon* exception, devoting his attention to the post-*Carpenter* search warrant. As a result, the parties' arguments often pass in the night.

Complicating matters, the parties treat the suppressed CSLI evidence as a single unit, but really it is two: (1) the 102 days' worth of CSLI records covering January 24, 2015 through May 5, 2015 (the "2015 CSLI"), first

9

authorized by the § 2703(d) order in July 2015; and (2) the 152 days' worth of CSLI records covering August 25, 2014 through January 23, 2015 (the "2014 CSLI"), first authorized by the post-*Carpenter* search warrant in 2018.[3] Because the issues differ, we deal with the two units of CSLI evidence separately, beginning with the CSLI evidence that was obtained first—the 2015 CSLI—and then turning to the CSLI evidence that was obtained three years later—the 2014 CSLI.

We hold that the *Krull* strand of the good-faith exception properly applies to the 2015 CSLI, since it was obtained pursuant to a pre-*Carpenter* warrantless order authorized by statute. Because the government pursued the statutory order in good faith, the CSLI should not have been suppressed. As for the 2014 CSLI, we hold that the *Leon* strand of the good-faith exception applies because those records were first sought and obtained under a post-*Carpenter* search warrant. The 2014 CSLI should not have been suppressed because the government acted in good faith when applying for the search warrant and, even if the government did not act in good faith, the warrant was supported by probable cause. Finally, we hold that any suppression of toll records and subscriber information under *Carpenter* was erroneous because *Carpenter* only applies to evidence that can be used to track a person's physical movements over time.

---

[3] The district court found, and the record indicates, that the government sought the 2014 CSLI only when it applied for the search warrant in 2018. However, the government made statements at oral argument suggesting that it already possessed both the 2015 CSLI *and* the 2014 CSLI by the time it applied for the warrant. Referring to the 2018 search warrant, the government said, "the dates are a little bit different, but we didn't get anything new," and later added, "we're not trying to recover what we got from the search warrant because it's the same thing we got back in 2015." The government's speculation notwithstanding, the record plainly shows that the § 2703(d) order sought only the 2015 CSLI. In any event, for purposes of resolving the issues in this appeal, we accept the district court's finding that the government did not seek the 2014 CSLI until the search warrant application in 2018.

No. 18-20729

A.

The government obtained the 2015 CSLI for Beverly's phone pursuant to a § 2703(d) order issued on July 8, 2015. Three years later, on the day *Carpenter* was decided, the government applied for—and got—a search warrant for this same CSLI. The district court characterized the government's warrant application as "meretricious" and stated that "the whole business was feigned." While acknowledging that the good-faith exception "allows a court to admit evidence obtained in compliance with a law later ruled unconstitutional," the court declined to apply the exception, reckoning that to do so "would render the Fourth Amendment empty."

We reject the district court's analysis because the good-faith exception—specifically, the *Krull* exception—properly applies. Just like in *Krull*, the investigators who obtained Beverly's CSLI in 2015 conducted a warrantless search authorized by a statute that was not found to be unconstitutional until after the search—in this case, years after. 480 U.S. at 350. Furthermore, just like in *Davis*, the operative statute had been deemed constitutional at the time of the search by then-controlling judicial precedent. 564 U.S. at 235. By all accounts, the FBI investigators acted in good faith *in 2015* when they reasonably relied on the authorization provided by § 2703(d).[4] Moreover, as in *Krull* and *Davis*, the deterrent rationale behind the exclusionary rule is inapplicable here: there is no reason to deter law enforcement officers from acting pursuant to federal statutes, especially those that have been upheld as

---

[4] The district court never considered whether investigators acted in good faith in 2015, instead focusing exclusively on the government's warrant application in 2018. Beverly likewise never argues that the investigators who obtained his CSLI in 2015 acted in bad faith. At the suppression hearing, Beverly conceded that these investigators "complied with the law that was in effect at the particular time." When asked at oral argument whether he was arguing that investigators acted in bad faith when they got the § 2703(d) order in 2015, Beverly's counsel responded, "I have no information."

11

No. 18-20729

valid by the relevant circuit court of appeals. *Davis*, 564 U.S. at 231; *Krull*, 480 U.S. at 349.

We find additional support for our holding in the fact that every one of our sister courts to have considered this question since *Carpenter* has agreed that the good-faith exception—specifically, the *Krull* exception—applies to CSLI obtained under § 2703(d) prior to *Carpenter*. *See United States v. Chambers*, 751 F. App'x 44, 47 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1209 (2019); *United States v. Goldstein*, 914 F.3d 200, 204 (3d Cir. 2019); *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 278 (2018); *United States v. Carpenter* (*Carpenter II*), 926 F.3d 313, 317–18 (6th Cir. 2019); *United States v. Curtis*, 901 F.3d 846, 848–49 (7th Cir. 2018); *United States v. Korte*, 918 F.3d 750, 757–59 (9th Cir. 2019), *cert. denied*, --- S. Ct. ---, 2019 WL 4923188 (2019); *United States v. Joyner*, 899 F.3d 1199, 1204–05 (11th Cir. 2018).

Of particular salience is the Sixth Circuit's decision in *Carpenter II*. On remand after the Supreme Court announced its new rule in *Carpenter* that § 2703(d) was unconstitutional, the Sixth Circuit affirmed Timothy Carpenter's conviction and, citing *Krull*, held that the CSLI evidence obtained pursuant to § 2703(d) was still admissible *against Carpenter himself* because of the good-faith exception. *Carpenter II*, 926 F.3d at 317–18. The same logic applies here: the district court should have applied the *Krull* strand of the good-faith exception and denied Beverly's motion to suppress the 2015 CSLI.

B.

The 2014 CSLI presents a slightly different issue. Unlike Beverly's 2015 CSLI (which the government first obtained back in 2015 under the § 2703(d) order), the record reflects that the government never sought or obtained the 2014 CSLI until it applied for the search warrant the day *Carpenter* came down

in 2018.[5] Because the government never obtained the 2014 CSLI under a pre-*Carpenter* statutory order, the *Krull* exception does not apply. Instead, we must subject the 2014 CSLI to a separate exclusionary rule analysis, the proper focus of which is the 2018 search warrant.[6] "We apply a two-step test to determine whether to suppress evidence under the exclusionary rule: first, we ask whether the good faith exception to the rule applies, and second, we ask whether the warrant was supported by probable cause." *United States v. Robinson*, 741 F.3d 588, 594 (5th Cir. 2014) (citing *United States v. Mays*, 466 F.3d 335, 342–43 (5th Cir. 2006)).

As noted earlier, the parties do not bifurcate the CSLI in their arguments, with the result that neither party directly addresses how we should treat the 2014 CSLI in relation to the 2018 warrant. The government argues generally that investigators applied for the search warrant in good faith, and that the warrant was supported by probable cause. Beverly's refrain is that "the government did not act in good faith" in obtaining the 2018 warrant. He also contends that the warrant is "fruit of the poisonous tree" because the evidence mustered in the warrant application was derived from Davis's CSLI, which—according to Beverly—was obtained via an unconstitutional § 2703(d) order.[7]

---

[5] Presumably, the government wanted the extra CSLI data to connect Beverly's phone to the earliest bank robberies—the ones that occurred between August 25, 2014 and January 24, 2015, the day the government lifted Davis's handprint from the teller counter.

[6] The government's statements at oral argument might be construed as an argument that because the dates were only "a little bit different" no separate analysis is required. But the dates are dramatically different, not "a little bit." The government sought over 250 days' worth of CSLI in its 2018 warrant application, more than double the 102 days' worth of CSLI it sought in the § 2073(d) order three years earlier. A separate analysis is necessary.

[7] Beverly claims that the district court's suppression order extended to the CSLI from Davis's phone. This is far from clear. The suppression opinion refers only to the § 2703(d) order pertaining to Beverly's CSLI. While Beverly is correct to say that he *argued for*

No. 18-20729

For its part, the district court interpreted the addition of the previously-unrequested 2014 CSLI to the 2018 warrant application as an underhanded attempt to "save" the government's bad-faith request for evidence it already had—namely, the 2015 CSLI. As a result, the district court suppressed the 2014 CSLI *and* the 2015 CSLI. But, as discussed above, the district court misapplied the *Krull* exception and should not have suppressed the 2015 CSLI. Because it was based on an error of law, we give no deference to the district court's finding that the government acted in bad faith in 2018. *Toussaint*, 838 F.3d at 507 ("But when influenced by an incorrect view of the law or an incorrect application of the correct legal test, a factual determination is reviewed *de novo*.").

Applying our two-step test, we hold that the good-faith exception—specifically, the *Leon* exception—properly applies to the 2014 CSLI. Because the government did not already possess the 2014 CSLI when it applied for the search warrant in 2018, its application was made in good faith. We further hold that even if the application was made in bad faith, the 2014 CSLI would still be admissible because the warrant was supported by probable cause.

The *Leon* strand of the good-faith exception applies here because the government first sought and obtained the 2014 CSLI in reliance on a search warrant, which may or may not have been supported by probable cause. *See Leon*, 468 U.S. at 918. To be sure, the *Leon* exception comes with a number of limitations, the first of which dictates that the good-faith exception will not apply if the warrant application is misleading. *Woerner*, 709 F.3d at 534; *Mays*, 466 F.3d at 343. The party challenging the good-faith exception bears the burden of establishing "that material misstatements or omissions are

---

suppression of the data gained from Davis's phone, he fails to point to any language in the suppression opinion where the district court granted his request.

contained in the supporting affidavit and that if those statements were excised (or the omitted information included), the affidavit would be insufficient to support the warrant." *United States v. Signoretto*, 535 F. App'x 336, 339 (5th Cir. 2013) (per curiam) (citing *United States v. Privette*, 947 F.2d 1259, 1261 (5th Cir. 1991)). Beverly does not meet this burden.

Beverly argues that the government's warrant application was misleading because the government "failed to disclose to the magistrate that it already had the information for which it sought a warrant." That argument would be worth considering if the focus here was the 2015 CSLI, which the government did indeed already possess. But, as discussed above, that evidence—the 2015 CSLI—comes in separately by means of the *Krull* exception, rendering the warrant irrelevant. With respect to the 2014 CSLI at issue here, where the warrant matters, the record reflects that the government did *not* already possess the information it sought. Beverly's argument is therefore unpersuasive, and he offers no alternative reasons for thinking that the government's failure to reveal its possession of the 2015 CSLI triggers the first *Leon* limitation.

But even if the government's failure to reveal its possession of the 2015 CSLI amounted to bad faith with respect to the 2014 CSLI, the government would still prevail under step two: probable cause. Probable cause means "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Piazza v. Mayne*, 217 F.3d 239, 245–46 (5th Cir. 2000) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). A search warrant application must show probable cause "to justify listing those items as potential evidence subject to seizure." *United States v. Sanjar*, 876 F.3d 725, 735 (5th Cir. 2017).

No. 18-20729

Here, the government's search warrant application satisfies the probable cause standard.[8] The application describes the FBI's investigation and how Davis's palm print was lifted from a teller counter in January 2015. It recounts Davis's subsequent arrest and how the Dodge Ram he was driving matched the truck used in the bank robberies. It further describes how Davis provided investigators with his phone number and fingered his co-conspirators, including Beverly, saying they participated in every one of the robberies between August 24, 2014 and May 2, 2015. The application highlights Davis's admission that the robbers communicated by cell phone immediately before, during, and after the bank robberies. Finally, the application states that "follow up investigations" confirmed Beverly's phone number—the one for which the government was requesting CSLI data. A prudent person looking at these facts and circumstances would be justified in believing that Beverly participated in the bank robberies.

Beverly's "fruit of the poisonous tree" response is unavailing. For one thing, there is no poisonous tree: the CSLI obtained for Davis's phone pursuant to § 2703(d) would be admissible under the *Krull* exception, just like Beverly's 2015 CSLI.[9] More fundamentally, though, Beverly lacks standing to assert that the search of Davis's phone records was unconstitutional. Beverly had no expectation of privacy in Davis's phone data, even if the search was

---

[8] For this reason, the 2014 CSLI would be admissible even if, *contra* the district court's factual recounting, the government somehow came to possess the 2014 CSLI before ever being authorized to do so, and even if that meant that its warrant application was made in bad faith.

[9] Besides, the evidence from Davis's phone that brought Beverly's number into suspicion was not Davis's CSLI, it was Davis's toll records. As Beverly concedes, "it appears the Government reviewed cell phone records of alleged co-defendants who the informing defendant called close in time to the robberies, to determine possible suspects involved." Beverly fails to appreciate that CSLI and toll records are different, and that toll records are not "poisonous" under *Carpenter*—see part IV.C, *infra*.

16

unconstitutional as to Davis. *See United States v. Powell*, 732 F.3d 361, 374 (5th Cir. 2013) ("Fourth Amendment rights . . . may not be vicariously asserted." (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969))); *United States v. Ibarra*, 948 F.2d 903, 905 (5th Cir. 1991) (holding that to establish a Fourth Amendment violation, defendants must show a legitimate expectation of privacy in the domain searched).

In sum, the district court should have applied the *Leon* strand of the good-faith exception and denied Beverly's motion to suppress the 2014 CSLI. Or, in the alternative, the district court should have denied the motion to suppress because the 2018 search warrant was supported by probable cause.

C.

Finally, the government argues that the district court erred in suppressing Beverly's toll records and subscriber information obtained under the § 2703(d) order. To the extent that the district court intended to suppress this evidence, it erred.[10]

The parties agree that *Carpenter*'s holding only applies to evidence that can reveal a person's physical movements over time. *See* 138 S. Ct. at 2217 (holding that a person "maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI"). Beverly contends that because the government "doubtless" will attempt to use his toll records and subscriber information to track his location over time, the toll records and subscriber information are equivalent to CSLI under *Carpenter*'s

---

[10] It is not clear whether the district court intended to suppress Beverly's toll records and subscriber information. The suppression opinion repeatedly mentions "cell-site location data" and never expressly refers to subscriber information or toll records. Still, the suppression order does specify that the "warrant and the order are void," and since both the warrant and the order extend to subscriber information and toll records, it is at least plausible that the district court intended to suppress this evidence along with the CSLI.

reasoning. We disagree. Beverly fails to articulate any credible grounds for accepting the first premise of his argument: namely, that toll records and subscriber records will be—or even can be—used to track someone's physical location over time. With no showing of that, Beverly's attempt to force this evidence into *Carpenter*'s holding is a nonstarter. In any event, *Carpenter* cautioned that it was a "narrow" decision that did not address, among other things, "other business records that might incidentally reveal location." *Id.* at 2220. We therefore decline to expand *Carpenter* in the way Beverly urges.

\* \* \*

For the forgoing reasons, we hold that the district court erred in granting Beverly's motion to suppress.

REVERSED.