# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 11, 2020

Lyle W. Cayce
Clerk

No. 19-30635

United States of America,

*Plaintiff—Appellee*,

*versus*

Matthew A. Beaudion,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:17-CR-319-1

Before Smith, Clement, and Oldham, *Circuit Judges*.

Andrew S. Oldham, *Circuit Judge*:

This is a case about GPS searches, Fourth Amendment standing, and the Stored Communications Act. Matthew Beaudion and his girlfriend, Jessica Davis, were drug dealers. Narcotics officers obtained a warrant for the GPS coordinates of Davis's cell phone and used the coordinates to intercept the car in which she and Beaudion were traveling. After losing a motion to suppress, Beaudion pleaded guilty to drug charges. He appealed. We affirm.

No. 19-30635

I.

During a narcotics investigation by the Monroe Police Department ("MPD"), multiple drug dealers and cooperating witnesses identified Beaudion and Davis as their suppliers. One witness informed MPD Officer Heckard that Beaudion and Davis were planning to drive from Houston to Monroe with four pounds of meth. The witness then called Davis on her cell phone, [XXX]-[XXX]-0889, to arrange a meth deal. Heckard listened in.

Heckard used that information and Davis's cell phone number to request a search warrant. In the warrant application, Heckard asked for the GPS coordinates of Davis's cell phone over the next sixteen hours. Louisiana District Judge Larry Jefferson found probable cause to support the request and issued the warrant. Heckard promptly faxed the warrant to Verizon's law-enforcement division. Verizon agreed to provide the longitude and latitude coordinates of Davis's phone as many times as Heckard called to request them within the sixteen-hour window. Heckard called six times. Each time he received a verbal recitation of the most recent GPS data and an estimated margin of error. The coordinates confirmed that Davis (or at least her phone) was headed east toward Monroe.

Heckard's final call to Verizon indicated that Davis was passing through Shreveport and on her way to Monroe. So Heckard and other MPD officers spread out along the interstate and waited for Davis to arrive. The officers stopped the car, searched it, and discovered the meth. Then they arrested Davis and Beaudion and recovered Davis's phone from her purse.

The United States charged Beaudion with conspiracy to possess with the intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Beaudion moved to suppress the drugs and other evidence on the theory that the warrant authorizing the GPS tracking was defective. A magistrate judge recommended denying the motion for lack of

Fourth Amendment standing, and the district court adopted that recommendation. The district court held in the alternative that Beaudion's warrant-related arguments did not entitle him to relief.

Beaudion entered a conditional guilty plea. The district court gave him a Guidelines sentence. Beaudion timely appealed his conviction and sentence by challenging the denial of his motion to suppress.

## II.

Beaudion argues that Heckard violated the Fourth Amendment by obtaining Davis's GPS coordinates via a defective warrant. We therefore begin with the original public meaning of the Amendment. *See, e.g.*, *Atwater v. City of Lago Vista*, 532 U.S. 318, 326, 338–39 (2001).

## A.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects[] against unreasonable searches and seizures." U.S. CONST. amend. IV. English search-and-seizure practices inform the original public meaning of this text. *See, e.g.*, *United States v. Jones*, 565 U.S. 400, 404–05 (2012).

For a long time, searches and seizures in England were relatively limited. Private parties who witnessed a felony could chase the perpetrator during the "hue and cry," but they rarely went house-to-house looking for unidentified suspects. WILLIAM J. CUDDIHY, THE FOURTH AMENDMENT: ORIGINS AND ORIGINAL MEANING 28–31 (2009). Customs officials could search ships for counterfeit currency and smuggled goods, but they rarely ventured onto land. *Id.* at 31–33. And guild officers could inspect merchandise for quality-control purposes, but they rarely investigated people outside their professions. *Id.* at 33–36. Given the limited

frequency and scope of these searches, they generated "little protest." *Id.* at 27.

Then the Tudors assumed the throne in 1485, and "the English law of search and seizure underwent a radical transformation." *Id.* at 44. The targeted investigations of prior centuries became general searches of sweeping scope. These searches were authorized by general warrants that commanded their enforcers "to search the houses, out-houses, or other places of any person . . . as upon good ground shall be suspected," to quote just one example. RICHARD KILBURNE, CHOICE PRESIDENTS RELATING TO THE OFFICE AND DUTY OF A JUSTICE OF PEACE 171–72 (London, Assigns of Rich. & Edw. Atkins 1680). Thus, the hue and cry morphed from targeted searches for identified felons into "private search[es] . . . in every Town" of "all suspected houses and places." MICHAEL DALTON, THE COUNTREY JUSTICE 83 (London, The Company of Stationers 1655). Customs officials received authorization to search not only ships but also any "shop, warehouse, or other place or places whatsoever which they . . . shall think good within this realm." 3 TUDOR ROYAL PROCLAMATIONS 190 (Paul L. Hughes & James F. Larkin eds., 1969). And the Crown expanded guild searches beyond guild members and their competitors to civilians outside the regulated profession. CUDDIHY, *supra*, at 54. The Crown also used general warrants and searches to regulate vagrancy, recreation, apparel, hunting, weapons, and social unrest. *Id.* at 44.

Some objected that such searches were unlawful and "unreasonable." Importantly, the objectors framed their arguments in terms of individual rights. Sir Edward Coke, for example, argued that general searches violated Magna Carta's individualized promise that "[n]o free man shall be taken or imprisoned or dispossessed, . . . nor will we go upon him, nor send upon him, except by the legal judgment of his peers or by the law of the land." GREAT CHARTER OF LIBERTIES, ch. 39 (1215), *reprinted in* SELECT

DOCUMENTS OF ENGLISH CONSTITUTIONAL HISTORY 42, 47 (George Burton Adams & H. Morse Stephens eds., 1929); *see* CUDDIHY, *supra*, at 110. Another frustrated journalist complained, "these scumms of Raskallity come[] with a warrant . . . to seize on our goods, & commit our Persons to their stinking Dungeons." MERCURIUS PRAGMATICUS No. 45, at 5–6 (Marchamont Nedham 1649).

Violations of personal rights necessitated personal remedies. Writing in the 1640s, Sir Matthew Hale suggested that informants whose criminal reports produced fruitless searches should be liable in tort to the person searched. *See* 2 MATTHEW HALE, HISTORIA PLACITORUM CORONAE 151 (London, E. & R. Nutt 1736); CUDDIHY, *supra*, at 269–70 (explaining that Hale "wrote much of the *Historia* in the 1640s" before it was published posthumously in 1736). Parliament agreed. *See* Fraud Act of 1660, 12 Car. 2, c. 19, § 4, *in* 7 THE STATUTES AT LARGE 460–61 (Danby Pickering ed., London, Joseph Bentham 1763) ("[I]f the information whereupon any house shall come to be searched, shall prove to be false . . . the party injured shall recover his full damages and costs against the informer[] by action of trespass . . . ."). And tort liability soon expanded to reach offending officers as well. Indeed, many of the canonical English search-and-seizure cases—whose "propositions were in the minds of those who framed the [F]ourth [A]mendment"—involved trespass suits against officers who authorized and executed general warrants. *Boyd v. United States*, 116 U.S. 616, 626–27 (1886); *see, e.g.*, *Entick v. Carrington*, 19 How. St. Tr. 1029, 1030 (C.P. 1765); *Wilkes v. Wood*, 19 How. St. Tr. 1153, 1153 (C.P. 1763).

Both the posture and pronouncements of those cases reflect the common-law understanding that unreasonable searches and seizures were a person-specific harm with a person-specific remedy. Not just anyone could sue in trespass. Rather, the proper plaintiff was one who "ha[d] a

property . . . in the soil[] and actual possession by entry." 3 WILLIAM BLACKSTONE, COMMENTARIES *210. Thus the plaintiff in *Entick* could seek relief because the defendants "broke and entered [his] dwelling-house" and "disturbed him in the peaceable possession thereof." 19 How. St. Tr. at 1030. And the plaintiff in *Wilkes* properly brought "an action of trespass[] for entering [his] house, breaking his locks, and seizing his papers." 19 How. St. Tr. at 1153. Lord Camden's famous remarks in *Entick* underscore this connection between an individual's property interests and his standing to challenge a search or seizure:

> The great end, for which men entered into society, was to secure their property. . . . By the laws of England, every invasion of private property, be it ever so minute, is a trespass. No man can set his foot upon my ground without my licence, but he is liable to an action . . . .
>
> According to this reasoning, it is now incumbent upon the defendants to shew the law, by which this seizure is warranted. If that cannot be done, it is a trespass.

19 How. St. Tr. at 1066. Such cases did not contemplate a remedy for those who objected to a trespass suffered by another.

B.

A similar approach to searches and seizures took hold in America. Colonial Massachusetts—which "formulated most of the ideas that formed the specific warrant clause of the Fourth Amendment," CUDDIHY, *supra*, at 327—patterned its first major limitation on general warrants after England's sue-in-trespass regime. *See* Naval Office Law of 1682, Mass. Col. St., *in* 5 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND: 1674–1686, at 338 (Nathaniel Shurtleff ed., Boston, William White 1854) ("[I]f any person be damnified by false information, wrongfull searching, or seizing any goods,

ships, or other vessell, he may recover the same by an action of the case . . . ."). And James Otis—whose arguments in the famous Writs of Assistance Case prompted Massachusetts to constitutionalize a right against unreasonable searches and seizures—complained of the same particularized harms that animated Coke, Hale, and Camden in England. *See* 2 CHARLES FRANCIS ADAMS, THE WORKS OF JOHN ADAMS 524 (Boston, Charles C. Little & James Brown 1850) (memorializing Otis's argument that general writs of assistance "totally annihilate" the "freedom of one's house" because they permit officers to "enter our houses[] when they please" and "break locks, bars, and every thing in their way"). Twenty-eight years later, Otis's objections made their way into the federal Constitution. *See* U.S. CONST. amend. IV.

All this history matters. It explains the Fourth Amendment's requirement for specific warrants. It demarcates unreasonable searches and seizures. And it suggests the remedies for violations of Fourth Amendment rights. Of course, the complexities of history sometimes leave room for debate in answering these questions. But one thing is beyond debate: the Fourth Amendment is not a weapon that uninjured parties get to wield on behalf of others. As with the common law that preceded it, the Fourth Amendment protects individuals' security "in *their* persons," "*their* . . . houses," "*their* . . . papers," and "*their* . . . effects." *Ibid.* (emphasis added). It does not protect individuals' security in the property of someone else.

## III.

Modern doctrine incorporates this history in the requirement of Fourth Amendment "standing." This "standing" concept ensures that those invoking the Amendment can vindicate only their *personal* security against unreasonable searches and seizures. And it requires us to reject Beaudion's claim.

## A.

According to the Supreme Court, the Fourth Amendment sometimes carries a "judicially created remedy" that allows a defendant to suppress evidence obtained through an unreasonable search or seizure. *United States v. Leon*, 468 U.S. 897, 906 (1984) (quotation omitted); *see Mapp v. Ohio*, 367 U.S. 643 (1961); *Weeks v. United States*, 232 U.S. 383 (1914). But the so-called exclusionary rule does not operate vicariously. Rather, a criminal defendant seeking suppression must show that "his *own* Fourth Amendment rights [were] infringed by the search [or] seizure which he seeks to challenge." *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) (emphasis added) (quotation omitted).

Today we call this principle "Fourth Amendment standing." *Id.* at 1530. Unlike the Article III standing that enables federal courts to exercise the judicial power, Fourth Amendment standing "is not a jurisdictional question." *Ibid.* It is instead "more properly subsumed under substantive Fourth Amendment doctrine," *Rakas v. Illinois*, 439 U.S. 128, 139 (1978), an outgrowth of the historical focus on people's security in "their" persons, houses, papers, and effects, *see Minnesota v. Carter*, 525 U.S. 83, 92 (1998) (Scalia, J., concurring) ("The obvious meaning of the provision is that *each* person has the right to be secure . . . in *his own* person, house, papers, and effects."). Therefore, a defendant seeking to suppress evidence must show not only that the police committed an unreasonable search or seizure, but also that the search or seizure "infringed [a Fourth Amendment] interest of the defendant" himself. *Rakas*, 439 U.S. at 140.

A defendant can establish this personalized interest in one of two ways. First, he may object to the "physical intrusion of a constitutionally protected area" in which he has a property interest. *United States v. Jones*, 565 U.S. 400, 407 (2012) (quotation omitted). And second, he may object to

government action that violates a "reasonable expectation of privacy . . . in the place searched." *Byrd*, 138 S. Ct. at 1527. Either way, the Fourth Amendment standing inquiry is both defendant- and place-specific: it requires that a *particular* defendant (the suppression movant) have a property or privacy interest in a *particular* place (the area searched). *See United States v. Hernandez*, 647 F.3d 216, 219 (5th Cir. 2011) (holding defendant lacked standing to challenge search because he "ha[d] not demonstrated that he had 'a legitimate expectation of privacy in the invaded place'" (quoting *Rakas*, 439 U.S. at 143)).

## B.

Here, the parties agree that the Government conducted a search when it used the GPS coordinates from Verizon to locate Davis's phone. But the district court held that Beaudion lacked standing to challenge that search and denied his suppression motion accordingly. We review the district court's standing determination *de novo* and its factual findings for clear error. *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014). "[W]e review the evidence in the light most favorable to the government as the prevailing party." *United States v. Rounds*, 749 F.3d 326, 338 (5th Cir. 2014). And we must "uphold the district court's ruling to deny the suppression motion if there is any reasonable view of the evidence to support it." *United States v. Massi*, 761 F.3d 512, 529 (5th Cir. 2014) (quotation omitted).

## 1.

To determine whether Beaudion has standing, we first identify the place that was searched. The warrant authorized Officer Heckard to search

> GPS coordinates and registered owner information of cell phone number [XXX]-[XXX]-0889. This is to include its location from current date and time of August 15, 2017 at 0813 hours to August 16, 2017 at 0000 hours. Cell phone number

> [XXX]-[XXX]-0889 is activated through Verizon Wireless and
> is currently being used by Jessica Nicole Davis.

Thus, the Government sought and Judge Jefferson granted sixteen hours of access to the GPS coordinates of Davis's phone. Nothing in the record or the parties' briefs suggests that MPD officers ever exceeded the scope of that warrant. Officer Heckard adhered to its terms by faxing the warrant to Verizon and periodically requesting the location of Davis's phone during the approved window. His requests didn't mention Beaudion or Beaudion's phone. In fact, Heckard testified that he did not learn that Beaudion even had a phone until after Beaudion's arrest. We therefore conclude that the GPS coordinates of Davis's phone constitute the relevant "place searched." *Byrd*, 138 S. Ct. at 1527.

Beaudion would have us go further. In his view, the Government's search extended beyond Davis and her phone to include Beaudion and the car in which he and Davis were traveling. That's so, he argues, because "[t]he purpose of the search warrant was to track the movements of [t]he car by using the GPS location of the cell phone inside of the car." That argument fails for at least two reasons.

First, the Supreme Court long ago rejected the "target" theory of a search under which "any criminal defendant at whom a search was 'directed' would have standing to contest the legality of that search." *Rakas*, 439 U.S. at 132–33. Framing the standing inquiry that way "would in effect permit a defendant to assert that a violation of the Fourth Amendment rights of a third party entitled him to have evidence suppressed at his trial." *Id.* at 133. What matters is not the *purpose* of a search but rather its *scope*.

Second, the Supreme Court has consistently defined the relevant scope of a search with granularity. In *United States v. Rakas*, for example, two defendants moved to suppress evidence discovered during the search of a

vehicle in which they were passengers. *Id.* at 129–30. The Court confined its analysis to the specific "portions of the automobile which were searched," holding that the defendants lacked an expectation of privacy "in the glove compartment [and the] area under the seat" where police found contraband. *Id.* at 148–49. Similarly, in *Collins v. Virginia*, the Court reviewed "photographs in the record" to determine "whether the part of the driveway where [the defendant's] motorcycle was parked and subsequently searched" qualified as constitutionally protected "curtilage." 138 S. Ct. 1663, 1670 (2018). Defining the scope of a search with such specificity makes sense: the Fourth Amendment itself authorizes warrants only when "the scope of the . . . search is set out with particularity." *Kentucky v. King*, 563 U.S. 452, 459 (2011); *see supra* Part II. Applying that particularized analysis here, the scope of the search—as reflected in both the warrant and Heckard's compliance with it—included only the GPS coordinates of Davis's phone and her corresponding location.

2.

Having concluded that the "place searched" is limited to location information about Davis, we now ask whether Beaudion has a Fourth Amendment property or privacy interest in that information. He doesn't.

The Supreme Court requires us to consider "whether the person claiming the constitutional violation ha[s] a legitimate expectation of privacy in the premises searched." *Byrd*, 138 S. Ct. at 1526 (quotation omitted). "[P]roperty concepts are instructive" in making that determination. *Ibid.* (quotation omitted). Indeed, the privacy inquiry "supplements . . . 'the traditional property-based understanding of the Fourth Amendment.'" *Ibid.* (quoting *Florida v. Jardines*, 569 U.S. 1, 11 (2013)). Privacy and property concepts "are often linked" because "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy

No. 19-30635

by virtue of the right to exclude." *Id.* at 1527 (quotation omitted). That's why we must remain "[e]ver mindful of the Fourth Amendment and its [property-based] history." *Id.* at 1526.

These principles certainly gave *Davis* a reasonable expectation of privacy in her phone and its location. She lawfully possessed and controlled the phone as its "primary user." And she owned the phone number for nearly a decade. But Davis's suppression motion is not before us. Rather, Beaudion must show a reasonable expectation of privacy in a phone and number he did not own.

Beaudion directs us to five facts as evidence of his reasonable privacy expectations in Davis's phone: (1) he purchased the physical phone and gave it to Davis; (2) he had permission to use the phone; (3) he had password access to the phone; (4) he accessed his Facebook account from the phone; and (5) he used the phone to capture intimate videos of him and Davis. Fact (1) is irrelevant. "[A] person has no standing to challenge a search or seizure of property that was voluntarily abandoned" or conveyed to another. *United States v. Powell*, 732 F.3d 361, 374 (5th Cir. 2013). And the Government correctly observes that fact (3) is not supported by the record. Davis testified only that Beaudion "ha[d] to put in [his] screen name and . . . password" when logging onto Facebook, not when accessing the phone more generally.

Facts (2), (4), and (5) reduce to a claim that Beaudion sometimes used Davis's phone for personal activities. There is no indication that Beaudion ever used or possessed the phone outside of Davis's presence. And the record doesn't tell us how often he accessed Facebook or captured intimate videos. What the record does tell us is that Davis was the "primary user"; Davis had the phone number long before she met Beaudion; Davis maintained possession of the phone throughout the day of the arrest; and Davis's parents paid the bill. No matter whether Beaudion actually expected

privacy in the phone, we cannot say his expectation of privacy would be reasonable. *Cf. United States v. Finley*, 477 F.3d 250, 254, 258–59 (5th Cir. 2007) (upholding district court's finding that employee reasonably expected privacy in a business phone that he continuously possessed and from which he excluded others), *abrogated on other grounds by Riley v. California*, 573 U.S. 373 (2014).

3.

The Supreme Court's decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), does not change the result. There, the Court considered a defendant's expectation of privacy in cell-site location information, or CSLI. CSLI is a time-stamped location record that phones generate as they connect to nearby cell sites. *Carpenter*, 138 S. Ct. at 2211–12. Because CSLI reveals a cell phone's historical location and because a "cell phone faithfully follows its owner," the Court held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." *Id.* at 2217–18.

The pronoun in that holding is important. *Carpenter* did not address the question whether an individual maintains a legitimate expectation of privacy in a record that reveals someone else's location. Here, the GPS coordinates told MPD officers nothing about Beaudion specifically. It was only because Officer Heckard spoke with a confidential informant and overheard her conversation with Davis that he suspected Beaudion would be nearby. Obviously, Heckard's interactions with the informant were not a search. *See United States v. Brathwaite*, 458 F.3d 376, 380 (5th Cir. 2006) ("[A]udio surveillance by or with the consent of a government informant does not constitute a search." (citing *United States v. White*, 401 U.S. 745 (1971))). And nothing in *Carpenter* requires us to hold that Heckard's non-

13

search became a search simply because Beaudion decided to ride with Davis. Beaudion's claim to Fourth Amendment standing therefore fails.

IV.

Even if Beaudion has standing to challenge the GPS search, he must also show the search was unreasonable. U.S. CONST. amend. IV; *see also Grady v. North Carolina*, 575 U.S. 306, 310 (2015) (per curiam) ("The Fourth Amendment prohibits only *unreasonable* searches."). He has not done so.[1]

The Fourth Amendment "does not specify" what amounts to an unreasonable search. *King*, 563 U.S. at 459. The Supreme Court has said its "ultimate touchstone" is simply "reasonableness." *Ibid.* (quotation omitted). But the Court has also said that "reasonableness" requires a "warrant supported by probable cause" or else a "specific exception to the warrant requirement." *Carpenter*, 138 S. Ct. at 2221 (quotation omitted).[2] That framework applies to CSLI, *see ibid.*, and we apply it to the GPS data collected here.

It is beyond dispute that Officer Heckard began tracking the GPS coordinates only after receiving a warrant. And Beaudion concedes that the warrant was "supported [by] probable cause with regard to [his] . . . illegal drug[] activities." Those two facts make this an easy case. *See United States*

---

[1] Because the Fourth Amendment standing analysis is itself a merits inquiry, our holding that Beaudion lacks standing of that sort does not prevent us from "addressing other aspects of the merits of a Fourth Amendment claim." *Byrd*, 138 S. Ct. at 1530.

[2] It is not obvious whether the "reasonableness as warrant" or instead the "reasonableness as reasonableness" cases better align with the Fourth Amendment's original public meaning. *Compare* CUDDIHY, *supra*, at 263–406 (describing the "evolution of the specific warrant as the orthodox method of search and seizure"), *with* William J. Stuntz, *The Substantive Origins of Criminal Procedure*, 105 YALE L.J. 393, 409 n.62 (1995) (rejecting the idea that "a broad modern-style warrant requirement [was] part of the Founders' picture of search and seizure law").

*v. Beverly*, 943 F.3d 225, 234–35 (5th Cir. 2019) (denying motion to suppress CSLI obtained pursuant to a "warrant . . . supported by probable cause").

Beaudion nevertheless claims for the first time on appeal that the GPS search was unreasonable because the authorizing warrant failed to comply with the Stored Communications Act ("SCA"). Circuit precedent requires us to review that argument for plain error. *See United States v. Vasquez*, 899 F.3d 363, 372–73 (5th Cir. 2018). We find none.

The SCA creates various mechanisms by which a "governmental entity may require a provider of electronic communication service . . . to disclose a record or other information pertaining to a subscriber to or customer of such service." 18 U.S.C. § 2703(c)(1). One such mechanism allows the Government to "obtain[] a warrant" from a state "court of competent jurisdiction" using "[s]tate warrant procedures." *Id.* § 2703(c)(1)(A). That is exactly what happened here. The Louisiana district court that issued the warrant is unquestionably a court of competent jurisdiction within the meaning of the SCA. *See id.* § 2711(3)(B) (defining "court of competent jurisdiction" to include "a court of general criminal jurisdiction of a State authorized by the law of that State to issue search warrants"); La. Const. art. V, § 16 ("[A] district court shall have original jurisdiction of all civil and criminal matters."); La. Code Crim. Proc. art. 161 (authorizing state judges to issue search warrants). And there is no indication that Officer Heckard or Judge Jefferson violated state warrant procedures.[3] So the warrant clearly complies with the plain text of the SCA.

---

[3] Beaudion argued before the district court that the warrant was procedurally defective because it lacked particularity and exceeded the state court's jurisdiction. But he fails to brief either point on appeal. So we need not address them. *See United States v. Delgado*, 672 F.3d 320, 329 n.8 (5th Cir. 2012) (en banc).

Beaudion disagrees. He contends that the SCA requires the Government to produce probable cause that the *subscriber or customer* committed a crime. And because Davis's parents were the relevant Verizon subscribers, Beaudion insists that the SCA invalidates a warrant premised on illegal activities not involving Davis's parents.

The argument borders on frivolous. Nowhere does § 2703 require a showing of probable cause relating to the subscriber. Subsection (c) merely requires that warrants comply with, as relevant here, "[s]tate warrant procedures." 18 U.S.C. § 2703(c)(1)(A). And subsection (d) authorizes disclosure of otherwise-protected information upon a "showing that there are reasonable grounds to believe that the . . . information sought [is] relevant and material to *an* ongoing criminal investigation." *Id.* § 2703(d) (emphasis added). The warrant issued by Judge Jefferson complied with these provisions.

Beaudion's SCA argument faces another problem: "[S]uppression is not a remedy for a violation of the Stored Communications Act." *United States v. Guerrero*, 768 F.3d 351, 358 (5th Cir. 2014). Congress could not have been clearer on this point. *See* 18 U.S.C. § 2708 ("The remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter."); *id.* §§ 2701, 2707, 2710, 2712 (authorizing certain civil, criminal, and administrative remedies, but not suppression). For Beaudion to suppress the GPS data, "he therefore must show that the . . . data was obtained not just in violation of the [SCA], but also in violation of the Fourth Amendment." *Guerrero*, 768 F.3d at 358. And as explained above, his Fourth Amendment claims fall far short.

## V.

Beaudion also argues that the district court should have granted his motion to suppress because the officers who intercepted him committed an

No. 19-30635

unconstitutional traffic stop. According to Beaudion, we must find a Fourth Amendment violation because "there is not a shred of evidence in the record of the reason the patrol officer [stopped] the car." In fact, he observes, "[t]here is not a shred of evidence about the stop" at all. Beaudion's argument is his own undoing. "The party seeking suppression has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Wallace*, 885 F.3d 806, 809 (5th Cir. 2018) (quotation omitted). Beaudion never challenged the constitutionality of the traffic stop in the district court. And he offers no argument that we should overlook his forfeiture under plain-error review.

AFFIRMED.