# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 17, 2025

Lyle W. Cayce
Clerk

No. 23-30777

United States of America,

*Plaintiff—Appellee*,

*versus*

Damion Wilson,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:22-CR-92-1

_____

Before Graves, Engelhardt, and Oldham, *Circuit Judges*.

Andrew S. Oldham, *Circuit Judge*:[*]

The principal question presented is whether police can *Terry* stop a citizen based *solely* on the fact that he is carrying a firearm. The answer is emphatically "no." We nevertheless uphold the *Terry* stop in this case on other grounds, reject the defendant's other challenges to his conviction and sentence, and affirm the district court's judgment in full.

_____

[*] Judge Graves joins this opinion with respect to Parts I, II–C, III–A, III–B, and III–C.

No. 23-30777

I

A

On March 16, 2022, federal agents stopped Damion Wilson pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). As he was approaching Wilson, Deputy U.S. Marshal Michael Atkins "noticed a bulge in [Wilson's] waist area" that seemed like "a hard object." ROA.252 (alteration in original). Based on his training, Deputy Atkins believed the object was a concealed firearm. Atkins and other federal agents then ordered Wilson to stop and put his hands up. Wilson complied. The agents asked Wilson if he was armed, and he replied that he was. The agents ordered Wilson to drop the backpack he was wearing, to turn around, and to place his hands behind his back. The agents hand-cuffed him. While Wilson was being cuffed, Deputy Atkins asked him if he had a concealed weapons permit. Wilson admitted that he did not.[1] The agents took the gun—which was loaded with an extended magazine—from Wilson.

Deputy Atkins told Wilson that he was not under arrest and that agents wanted to talk to him about Wilson's friend—a federal fugitive named Malik Fernandez. Wilson denied having seen or spoken to Fernandez in six years. However, on Wilson's public Instagram account, officers found a photo of Wilson and Fernandez together that had been posted approximately four months earlier.

Local police then arrested Wilson for carrying a firearm without a permit. Incident to that arrest, officers searched Wilson's backpack and found marijuana. Officers then obtained a search warrant for Wilson's

_____

[1] At the time, Louisiana law prohibited concealed carry without a permit under a "shall issue" regime. Louisiana has since adopted a permitless concealed carry scheme. *See* La. Rev. Stat. § 14:95(M).

apartment and found more marijuana, drug paraphernalia, and approximately $1,700.

## B

In May 2022, a grand jury indicted Damion Wilson on six counts, only four of which are relevant here: possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D) (Count 3); possession of a handgun in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count 4); maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1) (Count 5); and making a false statement to a federal agent in violation of 18 U.S.C. § 1001 (Count 6).

Wilson moved to suppress all physical evidence and statements arising from the March 2022 *Terry* stop and subsequent arrest. The district court denied the motion. The court found that the agents had reasonable suspicion to stop Wilson based on Deputy Atkins' observation of a bulge that appeared to be a concealed firearm. Pretermitting whether the officers' search of Wilson's backpack was lawful, the court held that the backpack's contents would have been inevitably discovered through an inventory search at the jail after Wilson's arrest for unlawfully carrying a firearm. The court also held that the fruits of the stop and search were not suppressible.

At trial, the jury convicted Wilson on the four counts arising from the March 2022 episode. The PSR's advisory Guideline range was 21 to 27 months of imprisonment, plus the consecutive statutory minimum sentence of five years on the firearm conviction (Count 4). *See* 18 U.S.C. § 924(c)(1)(A)(i). The district court adopted the PSR. On October 18, 2023, the court sentenced Wilson to a within-Guidelines sentence of 27 months for Counts 3, 5, and 6, and to a consecutive term of 60 months for Count 4, the firearms charge—for a total of 87 months. Wilson timely appealed.

No. 23-30777

## II

We first address Wilson's motion to suppress. We "review factual findings for clear error and conclusions of law *de novo.*" *United States v. Smith*, 952 F.3d 642, 646 (5th Cir. 2020). "We view the evidence in the light most favorable to the party that prevailed below"—here, the Government. *Ibid.* (quotation omitted). We will affirm the district court's judgment if there is any reasonable view of the evidence supporting its decision. *Ibid.* It is the Government's burden to prove the validity of a warrantless search by a preponderance of the evidence. *United States v. Conlan*, 786 F.3d 380, 387 (5th Cir. 2015). Where, as here, "a district court's denial of a suppression motion is based on live oral testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses." *United States v. Bass*, 996 F.3d 729, 736–37 (5th Cir. 2021) (quotation omitted).

We (A) begin by explaining the history and tradition of searches and seizures prohibited by our Fourth Amendment. Then we (B) hold that the district court's justification for the *Terry* stop cannot stand. The mere fact that a citizen carries a firearm does not create reasonable suspicion that he committed a crime. Finally, we (C) hold that ample other evidence nevertheless justified the *Terry* stop in this case.

### A

If any principle of criminal procedure was clear at the Founding, it was that officers cannot seize or search without *individualized* suspicion that a *particular* person committed a *particular* crime.

Take for example the infamous writs of assistance. Such writs are of ancient origin. *See* Josiah Quincy, Jr., Reports of Cases Argued and Adjudged in the Superior Court of Judicature of the Province of Massachusetts Bay, 1761–

4

No. 23-30777

1772 (1865) (Appendix I, Writs of Assistance), *reprinted in* 5 The Founders' Constitution 222, 222 (Philip B. Kurland & Ralph Lerner eds., 1987).[2] While the English Crown used writs of assistance to do many different things throughout English history, *see ibid.*, their most relevant pre-Founding use is illustrated by Charles II's Customs Act of 1662. It provided:

> And it shall be lawful to or for any Person or Persons, autho-rized by Writ of Assistance under the Seal of his Majesty's Court of Exchequer, to take a Constable, Headborough [mayor] or other publick Officer inhabiting near unto the Place, and in the Day-time to enter, and go into any House, Shop, Cellar, Warehouse or Room, or other Place, and in Case of Resistance, to break open Doors, Chests, Trunks and other Package[s], there to seize, and from thence to bring, any Kind of Goods or Merchandize whatsoever, prohibited and uncustomed . . . .

An Act for Preventing Frauds, and Regulating Abuses in His Majesty's Customs (1662), 13 & 14 Car. 2 c. 11, § 5, *in* 3 The Statutes at Large 237 (Owen Ruffhead ed., London, 1770). Such writs thus authorized revenue officers to search for and seize uncustomed goods—wherever they might be found and by whomever they might be held. *See* Quincy, *supra*, at 222.

Patriots in colonial America detested writs of assistance. In the immortal words of James Otis, such writs were "the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English law-book." *John Adams's Reconstruction of Otis's Speech in* The Writs of Assistance Case, *reprinted in* Collected Political Writings of James Otis 11, 11 (Richard

---

[2] This first appendix to *Quincy's Reports*, which was written by Supreme Court Justice Horace Gray, Jr., provides an "elaborate history of the writs of assistance." *Boyd v. United States*, 116 U.S. 616, 625 n.4 (1886).

Samuelson ed., 2015). Why? Because they specified *no particular person*, writs of assistance jeopardized the liberties of *everyone*—and "place[d] the liberty of every man in the hands of every petty officer." *Id.* at 12. As Otis put it in 1761:

> Every one with this writ may be a tyrant; if this commission be legal, a tyrant in a legal manner also may control, imprison, or murder any one within the realm. In the next place, it is perpetual; there is no return. A man is accountable to no person for his doings. Every man may reign secure in his petty tyranny, and spread terror and desolation around him.

*Ibid.*

Writs of assistance were closely related to general warrants. *See Carpenter v. United States*, 585 U.S. 296, 349 n.6 (2018) (Thomas, J., dissenting) (citing *Stanford v. Texas*, 379 U.S. 476, 481 (1965)). "The most common meaning of 'general warrant' was a warrant that lacked specificity as to whom to arrest or where to search; for example, a warrant directing arrests of 'suspected persons' or a search of 'suspicious places.'" Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 MICH. L. REV. 547, 558 n.12 (1999); *see also ibid.* (discussing other definitions). General warrants originated during England's Tudor Dynasty. *See* WILLIAM J. CUDDIHY, THE FOURTH AMENDMENT: ORIGINS AND ORIGINAL MEANING, 602–1791, at 44 (2009); *see also United States v. Beaudion*, 979 F.3d 1092, 1094–96 (5th Cir. 2020) (describing the origin and evolution of general warrants).

To understand how general warrants worked, consider *The North Briton* cases. In April 1763, John Wilkes published one of the most infamous pieces of political dissent in Anglo-American history: *The North Briton No. 45.* In that newspaper, Wilkes attacked the Treaty of Paris, which ended the Seven Years War. He contended that the Treaty had "drawn the contempt

of mankind on our wretched negotiators." John Wilkes, *The North Briton No. XLV* (Apr. 23, 1763), *reprinted in* The North Briton from No. I to No. XLVI Inclusive 302, 303 (London, 1769). And he criticized certain "unjustifiable, public declarations" that King George III had made about the Treaty in his speech to Parliament. *Ibid.* For such then-scandalous criticisms of the Crown, Lord Halifax issued a warrant to arrest Wilkes and put him in the Tower of London. But as most relevant here, Halifax also issued a general warrant to arrest "the authors, printers and publishers" of *The North Briton No. 45*—without identifying them. *See Money v. Leach*, 97 Eng. Rep. 1075, 1078 (K.B. 1765) (reproducing the warrant).

Pursuant to that general warrant, the King's officers "entered into" the "dwellinghouse" of Dryden Leach and arrested him on suspicion of seditious libel. *Id.* at 1076. As it turned out, Leach had not, in fact, published *The North Briton No. 45*. *See ibid.* So he brought a trespass action against the arresting officers for "breaking and entering [his] house, and imprisoning him, without any lawful or probable cause." *Id.* at 1075. And in one of the most celebrated decisions of the King's Bench, Lord Chief Justice Mansfield declared the general warrant "void." *Id.* at 1088. Wilkes won, too. *See R. v. Wilkes*, 95 Eng. Rep. 737, 742 (K.B. 1763) ("Mr. Wilkes must be discharged from his imprisonment: whereupon there was a loud huzza in Westminster-Hall. He was discharged accordingly."); *Wilkes v. Wood*, 98 Eng. Rep. 489, 499 (C.P. 1763). As did several of Wilkes's associates. *See, e.g.*, *Huckle v. Money*, 95 Eng. Rep. 768, 769 (C.P. 1763) ("To enter a man's house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish Inquisition . . . .").[3]

---

[3] *The North Briton* cases also paved the way for *Entick v. Carrington*, 95 Eng. Rep. 807 (C.P. 1765). In that case, Lord Halifax had issued a warrant "to make strict and diligent

No. 23-30777

All of this had a profound impact on America at the Founding. John Adams attributed the American Revolution to Otis's 1761 indictment of writs of assistance: "Then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born." 10 CHARLES FRANCIS ADAMS, THE WORKS OF JOHN ADAMS, SECOND PRESIDENT OF THE UNITED STATES 248 (Boston, Little, Brown & Co. 1856). The Declaration of Independence lists writs of assistance as one of King George's worst abuses: "He has . . . sent hither swarms of Officers to harass our people, and eat out their substance" using writs of assistance and general warrants. THE DECLARATION OF INDEPENDENCE para. 12 (1776). And cases like *Leach*, *Wilkes*, and *Entick* form the backbone of our Fourth Amendment. *See, e.g.*, *Boyd v. United States*, 116 U.S. 616, 625–27 (1886) (so holding); *Beaudion*, 979 F.3d at 1094–96 (same); *Carpenter*, 585 U.S. at 391–92 (Gorsuch, J., dissenting) (so recognizing).

\*

Whether by writ of assistance, general warrant, or warrantless instinct, an officer cannot search or seize a person carrying papers merely because such papers could contain seditious libel. Rather, the officer must

---

search for John Entick, the author, or one concerned in the writing of several weekly very seditious papers, [e]ntitled *The Monitor, or British Freeholder*." *Id.* at 810. That was obviously not a general warrant. *See* T.T. Arvind & Christian R. Burset, *A New Report of* Entick v. Carrington *(1765)*, 110 KY. L.J. 265, 281 (2021–22) ("[L]ack of specificity wasn't the problem with the warrant in *Entick*, which actually named its target. The problem, rather, was that the warrant unnecessarily authorized the search of private papers." (footnotes omitted)). Lord Chief Justice Camden famously held the warrant used against Entick illegal and void because "[p]rivate Papers are the only way of concealing a man's most valuable Secrets either in his Profession or any other Way, & are his dearest property. Where private Papers are carried away, the Secrets contained in them may be discovered." *Id.* at 287 (quoting Edward Moore's report of *Entick*).

8

have reason to believe that a particular person is carrying particular papers containing particular evidence of criminality.

So too with firearms. The right to keep and bear arms in this country "may be considered as the true palladium of liberty." 1 St. George Tucker, Blackstone's Commentaries app'x 300 (Philadelphia, Birch & Small 1803). True, a particular person could keep or bear a particular firearm in an unlawful way. But an officer cannot search or seize a person simply because he is keeping or bearing a firearm—any more than an officer can search or seize a person simply because he is keeping or bearing a piece of paper.

B

The district court's approach, by contrast, is inconsistent with the Constitution's history and tradition. It reasoned that carrying a firearm is "presumptively illegal" in Louisiana. Thus, officers can presume that every firearm is being carried illegally—and *Terry* stop every gun owner without any suspicion that any particular gun owner is doing anything wrong. We (1) explain this presumption of illegality. Then we (2) reject it as a basis for *Terry* stops.

1

At the time of Wilson's arrest, Louisiana law prohibited "[t]he intentional concealment of any firearm, or other instrumentality customarily used or intended for probable use as a dangerous weapon, on one's person." La. Rev. Stat. § 14:95(A)(1)(a).[4] But the prohibition did "not apply to a person with a valid concealed handgun permit." *Id.* § 14:95(A)(1)(b). Permits for concealed handguns "issue[d] . . . to any Louisiana resident" who met

_____

[4] Louisiana has since adopted permitless concealed carry. *See supra* note 1.

No. 23-30777

the statutory requirements. *Id.* § 40:1379.3(A)(1). And a "permittee armed with a handgun" must "notify any police officer who approaches the individual in an official manner or with an identified official purpose that the individual has a weapon on his person, submit to a pat down, and allow the officer to temporarily disarm him." *Id.* § 40:1379.3(I)(2).

The Supreme Court of Louisiana had described this statutory scheme as "not a complete ban on the carrying of concealed weapons," but instead merely a prohibition on "carrying a concealed firearm (or other dangerous weapon) in public without a permit." *In re J.M.*, 144 So. 3d 853, 865–66 (La. 2014). The permit requirements, in turn, were minimal: they included age, mental fitness, immigration status, and criminal history. *See* La. Rev. Stat. § 40:1379.3(C). But if a person was charged with unlawfully carrying a firearm under Louisiana law, it was the defendant's burden to prove that he had a permit. *State v. Moore*, 390 So. 3d 413, 415 (La. 2024) (citing *State v. Augillard*, 371 So. 2d 798, 800 (La. 1979)).

The district court determined that this statutory scheme made carrying a firearm presumptively unlawful. And in accordance with certain out-of-circuit precedents, it held that the presumption justified *Terry* stopping anyone carrying a firearm anywhere in the State of Louisiana.[5]

---

[5] *See, e.g.*, *United States v. Pope*, 910 F.3d 413, 415–16 (8th Cir. 2018) (reasoning that carrying a concealed weapon establishes reasonable suspicion on the grounds that Iowa law makes concealed carry presumptively unlawful without a permit, which "is merely an affirmative defense"); *Foster v. City of Indio*, 908 F.3d 1204, 1215 (9th Cir. 2018) (per curiam) (reasoning that because California "law makes it generally unlawful to carry a concealed weapon without a permit, a tip that a person is carrying a concealed firearm raises a reasonable suspicion of potential criminal activity, even if the tip does not state that the person is carrying the firearm illegally or is about to commit a crime"); *United States v. Lewis*, 674 F.3d 1298, 1304 (11th Cir. 2012) (reasoning that the fact of a concealed handgun established reasonable suspicion where Florida law criminalized concealed carry without a

No. 23-30777

2

We must reject the district court's approach. That is for six reasons.

*First*, the district court's *per se* presumption of illegality is inconsistent with our Constitution's history and tradition. When America declared its independence from England, it also declared its independence from writs of assistance and general warrants. That means officers are no longer allowed to presume that people walking down the street are violating the law. And they certainly cannot presume that gun owners *as a class* are violating the law. To hold otherwise is to derogate both our Fourth Amendment and our Second.

*Second*, the district court's *per se* presumption of illegality is inconsistent with the *Terry* doctrine. There is no "firearm exception" in that doctrine. *Florida v. J.L.*, 529 U.S. 266, 272 (2000). Rather, the entirety of the *Terry* doctrine depends on reasonable, *individualized* suspicion. That is why the Supreme Court instructs us to consider "the totality of the circumstances" to determine whether an officer could infer that a particular suspect acted or was about to act unlawfully. *Navarette v. California*, 572 U.S. 393, 397 (2014) (quotation omitted). This inference "turn[s] on the assessment of probabilities in particular factual contexts." *Florida v. Harris*, 568 U.S. 237, 244 (2013) (quotation omitted). And these assessments can be based on "certain common sense conclusions about human behavior" drawn by "practical people." *United States v. Cortez*, 449 U.S. 411, 418 (1981); *accord Brinegar v. United States*, 338 U.S. 160, 175 (1949). All these precedents focus

---

permit, which was an affirmative defense); *United States v. Pontoo*, 666 F.3d 20, 31–32 (1st Cir. 2011) (finding probable cause based on possession of a concealed handgun because Maine prohibits concealed carry unless someone jumps through "several procedural hoops"); *United States v. Gatlin*, 613 F.3d 374, 378–79 (3rd Cir. 2010) (inferring reasonable suspicion justifying a *Terry* stop from mere firearm possession because Delaware presumes concealed firearms are illegal).

11

on a particular person and his particular circumstances. None allows officers to make class-wide, blanket determinations that all people of some disfavored type are criminals. As then-Judge Barrett put it: "[A] mere possibility of unlawful use of a gun is not sufficient to establish reasonable suspicion." *United States v. Watson*, 900 F.3d 892, 896 (7th Cir. 2018) (quotation omitted).

*Third*, the district court's *per se* presumption of illegality is inconsistent with Fourth Amendment doctrine more generally. The Supreme Court has blessed very limited kinds of suspicionless searches or seizures—for example, roadblocks to combat drunk driving, *see Michigan Dep't of State Police v. Sitz*, 496 U.S. 444 (1990); roadblocks to combat illegal immigration, *see United States v. Martinez-Fuerte*, 428 U.S. 543 (1976); and random drug testing at schools, *see, e.g.*, *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995). In each of these circumstances, the Court emphasized that such programs are lawful because they advance programmatic needs of public safety in places where citizens have lower privacy interests (like highways and public schools). The Court emphasized, however, that such programs *cannot* be used to combat crime more generally. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) (suspicionless roadblocks cannot be used to advance "normal need for law enforcement" like interdicting drugs). And in any event, there is a world of difference between a programmatic, suspicionless search for everyone and a targeted, suspicionless search for gun owners.

*Fourth*, the district court's *per se* presumption of illegality conflates the substance of state law with its procedure. It is obviously true that officers must consult state law to determine what conduct is illegal—and hence what conduct could justify a *Terry* stop or a warrant. If State *A* makes it illegal to drive with a BAC over 0.08% and State *B* sets the limit at 0.05%, an officer must know his State's rule to determine whether and how to search or seize a particular driver. But that is a *substantive* distinction of state law. Whether

state law allocates the burden to prove a particular element to prosecutors or the defense, by contrast, is purely a question of state trial *procedure*. *See Adams v. Williams*, 407 U.S. 143, 149 (1972) ("Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."); *see also Draper v. United States*, 358 U.S. 307, 311–12 (1959). And we are aware of no basis in history, tradition, or Supreme Court precedent for saying that state trial procedures allow officers to presume that entire classes of citizens are criminals. To the contrary, "Fourth Amendment protections are not so variable and cannot be made to turn upon such trivialities" of state trial procedures. *Virginia v. Moore*, 553 U.S. 164, 172 (2008) (quotation omitted); *cf. Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (explaining Fourth Amendment reasonableness does not turn on State labels).

*Fifth*, the district court's *per se* presumption of illegality is doctrinally indeterminate. While some courts have inferred a presumption of illegality where the defendant's permit to carry is an affirmative defense at trial, *see supra* note 55, other courts have said no presumption applies where the State "shall issue" permits to any qualified applicant, *see, e.g.*, *United States v. Brown*, 925 F.3d 1150, 1154 (9th Cir. 2019). The rationale is that where the State has no discretion to deny a permit to a qualified applicant, as was true in Louisiana, officers cannot presume that any particular armed person is unpermitted. *See ibid.* Louisiana law thus had two features—the affirmative defense rule and the shall-issue requirement—that pointed in opposite directions for presuming illegality. This further illustrates that the presumption should be rejected.

*Sixth*, the district court's *per se* presumption of illegality would have untenable consequences in other areas. For example, driving a car without a license is unlawful in every State. *See, e.g.*, La. Rev. Stat. § 32:402(B)(1)(a)(i). Drivers are generally obligated to have their licenses in

their possession and display them to officers. *See, e.g.*, *id.* § 32:411.1(A)(1). And while Louisiana law is unclear on whether licensure is an affirmative defense, some States make it clear that defendants in unlicensed-driving cases hold the burden of proof. *See, e.g.*, Tex. Transp. Code § 521.025(d). Undoubtedly, obtaining a driver's license is more difficult than acquiring a concealed carry permit in a shall-issue State. Based solely on the observation that someone is driving a car, does an officer have reasonable suspicion that the driver is unlicensed?

Obviously, no: "[S]topping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment" without "articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered." *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). This was true even though driving, like carrying a firearm, is "subject to state regulation." *Id.* at 662. Thus, "[w]ere the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed." *Id.* at 662–63. Put differently, officers cannot assume that citizens engaging in an activity subject to licensing are unlicensed. Without more facts, it is "[in]sufficiently *probable* that the observed conduct suggests unlawful activity." *Watson*, 900 F.3d at 896 (emphasis added) (quotation omitted). That holds true regardless of whether a driver's license is hard or easy to get, whether possession of a license is an affirmative defense (as it is in Texas and as it might not be in Louisiana), or whether driver's licenses must be produced to officers upon request. So too with guns: "As a matter of law and common sense, a police officer observing an unknown individual can no more identify whether that individual has a license in his wallet than discern whether he is a criminal." *Commonwealth v. Hicks*, 652 Pa. 353, 387 (2019); *see also United States v.*

*Ubiles*, 224 F.3d 213, 218 (3d Cir. 2000) (posing the analogy that possession of a wallet does not suggest possession of counterfeit bills).

If anything, the Constitution's prohibition on presuming illegality should be stronger for gun owners than for car drivers. Unlike driving on public highways, which is a State-created and State-regulated privilege, "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 10 (2022). So regardless of how States' permitting schemes are set up, keeping and bearing arms is *presumptively lawful* nationwide. We therefore refuse to "single out the Second Amendment for disfavor," *Wilson v. Hawaii*, 145 S. Ct. 18, 20 (2024) (Thomas, J., respecting the denial of certiorari), and we reject the district court's categorical rule that presumes Louisiana gun owners are committing crimes.

## C

Despite the district court's erroneous application of a categorical rule, we hold that the officers had reasonable suspicion to stop Wilson based on the facts in the record.[6]

To perform a *Terry* stop, officers must have "reasonable suspicion that criminal activity may be afoot." *Navarette*, 572 U.S. at 401 (quotation omitted). Reasonable suspicion requires only "some minimal level of objective justification for making the stop." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quotation omitted). "Although a mere hunch does not create

---

[6] Our esteemed colleague agrees that the record supports the *Terry* stop in this case but disagrees that we should correct the district court's erroneous rule that possession of a firearm is presumptively unlawful. *Post*, at 29 (GRAVES, J., concurring in relevant part). That is puzzling because the premise of our harmless-error holding is, well, the district court's *error*. We respectfully disagree that it is "superfluous and unhelpful" to explain that error. *Id.* at 30.

reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (quotation omitted). This "less demanding standard" allows "officers to make commonsense judgments and inferences about human behavior." *Id.* at 380–81 (quotation omitted).

When reviewing reasonable suspicion, we consider "the totality of the circumstances—the whole picture." *Navarette*, 572 U.S. at 397 (quotation omitted). The totality of the circumstances test "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation omitted). "Relevant facts and considerations may include a description of a suspect, a suspect's location and proximity to known or reported criminal activity, the timeliness of information or the stop, a suspect's behavior, and the officer's experience." *United States v. Alvarez*, 40 F.4th 339, 346 (5th Cir. 2022). "Facts that appear innocent when viewed in isolation can constitute reasonable suspicion when viewed collectively." *Ibid.*

In this case, officers had ample reasonable suspicion to stop Wilson—separate and apart from the fact that he was a gun owner.

Officers did not approach or stop Wilson only because they suspected him of carrying a gun. They approached and stopped him because they wanted to interview him about his friend Fernandez, who was a federal fugitive involved in a marijuana-trafficking-related shootout. So Wilson's "proximity to known or reported criminal activity" was a factor supporting reasonable suspicion. *Ibid.* And it is well established that a "suspect's companionship with or propinquity to an individual independently suspected of criminal activity is a factor to be considered in assessing the reasonableness

16

of a seizure." *United States v. Thomas*, 997 F.3d 603, 611 (5th Cir. 2021) (quoting *United States v. Silva*, 957 F.2d 157, 161 (5th Cir. 1992)); *see also United States v. Michelletti*, 13 F.3d 838, 842 (5th Cir. 1994) (en banc) (incorporating the suspicious activities of a defendant's nearby associates into the reasonable-suspicion analysis).

Many facts known to the officers connected Wilson to Fernandez at the moment of the *Terry* stop: Fernandez's last known address was a home that belonged to a member of Wilson's family. Three people living there told Deputy Atkins that Fernandez's last known location was with Wilson and that if Deputy Atkins wanted to find Fernandez, he needed to find Wilson because "they're always known to be together" and the two were "like brothers." ROA.425. Once officers arrived at Wilson's apartment complex, Deputy Atkins showed pictures of Fernandez to neighbors and complex employees. And, critically, they told Deputy Atkins that they had seen Fernandez in and around Wilson's apartment often, including within the last week.

All of that alone would give officers reasonable suspicion to *Terry* stop Wilson for, at a minimum, his potential involvement in drug trafficking or harboring a federal fugitive. Moreover, when officers approached Wilson, they were aware of his criminal history. Deputy Atkins and the other officers knew that Wilson had recently been charged with (1) possession with the intent to distribute drugs and (2) possession of a firearm in furtherance of a drug trafficking crime.

Thus, this is not a case of officers stopping someone simply because they presumed he was a criminal based solely on the fact he was carrying a gun in Louisiana. The officers had ample grounds to think criminal activity was afoot—*even before* Deputy Atkins saw the bulge in Wilson's waistband. Under such circumstances, precedent plainly allowed the officers to conduct

a *Terry* stop and a protective search. *See Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977) (so long as officer has reasonable suspicion to conduct a stop *before* seeing a gun, his observation of a "bulge" permits the conclusion that the suspect is "armed"); *see also United States v. Cooper*, 43 F.3d 140, 147 n.9 (5th Cir. 1995) ("A large bulge located in such an unusual place on a suspect may be a factor warranting reasonable suspicion."). We therefore affirm the district court's rejection of Wilson's Fourth Amendment challenge.

### III

We turn now to Wilson's four remaining challenges. All fail under plain-error review.

For us to reverse the district court under plain-error review, the defendant must show (1) an error or defect that is (2) plain or obvious and that (3) affected his substantial rights, *i.e.*, "affected the outcome of the district court's proceedings." *Puckett v. United States*, 556 U.S. 129, 135 (2009). If a question of law is subject to reasonable dispute, the alleged error is not plain or obvious. *Ibid.* If those three conditions are met, we have "the *discretion* to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Ibid.* (quotation omitted).

### A

Wilson first asserts that the evidence was insufficient to support his conviction for making a false statement to a federal agent. We review for plain error, as the parties concede, because Wilson did not move in the district court for a judgment of acquittal based on insufficient evidence. *See United States v. Suarez*, 879 F.3d 626, 630 (5th Cir. 2018).

Plain-error review itself presents a high bar. "But where, as here, the unpreserved claim is a sufficiency-of-the-evidence challenge, the standard of

review is doubly difficult." *United States v. Yusuf*, 57 F.4th 440, 445 (5th Cir.), *cert. denied*, 143 S. Ct. 1793 (2023). This court will reverse only when the appellant shows that "the evidence was so completely, obviously, and unbelievably inadequate that allowing the verdict to stand would be a 'shocking' and 'manifest miscarriage of justice.'" *Ibid.* (quoting *United States v. Smith*, 878 F.3d 498, 503 (5th Cir. 2017)). "These combined standards are tantamount to the eye of a virtually impassable needle." *Ibid.*

The jury convicted Wilson of lying when he told officers that he had not seen Fernandez in six years. The Government's evidence consisted mainly of (1) Deputy Atkins' testimony about the Instagram photos of Wilson and Fernandez together that were posted on November 27, 2021; (2) the photos themselves; and (3) the parties' stipulation that a Mississippi sheriff's deputy tried but failed to pull over a car driven by Wilson with Fernandez sitting shotgun just five days after Wilson's arrest. Wilson contends that the date of Instagram posting does not imply that the photos were taken within the last six years. And as to the Mississippi incident, Wilson argues that events taking place *after* his statement to Deputy Atkins are irrelevant.

We disagree. A reasonable jury could conclude that someone who claimed not to have seen or spoken to someone in six years would be unlikely to (1) post photos on Instagram showing them together less than four months before and (2) be found driving together five days later. Furthermore, the jury saw photos of Wilson from his July 21, 2021 arrest and a high school identification card from 2020. It could have compared those photos to the ones on Instagram and concluded they had not been taken six years earlier, when Wilson would have been fifteen or sixteen. And the jury could have reasonably considered additional evidence tending to show that Wilson was lying: Fernandez's last known residence was Wilson's family home, tenants at that address told officers that Wilson and Fernandez were like brothers, and witnesses at Wilson's apartment complex told officers that they had

often seen the two men together in the complex. This evidence was not "completely, obviously, and unbelievably inadequate." *Ibid.*

B

Wilson next challenges the district court's admission of Deputy Atkins' lay opinion testimony that identified him in a photograph with Fernandez. We hold that (1) plain-error review applies to this claim and (2) Wilson's challenge fails under any standard.

1

The parties disagree about the standard of review. Wilson argues that our review of the district court's evidentiary ruling should be for abuse of discretion because he "objected repeatedly to the admission of exhibits and testimony" from Deputy Atkins, preserving the error. Blue Br. at 43. The Government responds that our review should be for plain error because Wilson's objections at trial were not sufficiently specific to preserve the error for appeal.

We agree with the Government. Evidentiary errors must be preserved by stating the specific ground of objection. *See* Fed. R. Evid. 103(a)(1)(B). "Because the primary purpose of Fed. R. Evid. 103(a)(1) is to assist the judge in avoiding error and correctly ruling on evidentiary objections, the corollary is that to preserve the objection, the 'specific ground' for the stated objection must be the correct one." *United States v. Seale*, 600 F.3d 473, 486 (5th Cir. 2010). On appeal, Wilson argues that Deputy Atkins' testimony violated Rule 701's requirements for lay testimony. But Wilson's objections at trial, while numerous, were not specific to Rule 701 or lay testimony. Wilson objected under the headings of "best evidence" (Rules 1002–1004), "hearsay" (Rules 801 *et seq.*), "relevance" (Rule 401), and "no way to properly confront [] or cross-examine" Deputy Atkins. ROA.668. None of

that put the district court on notice of the objection Wilson now urges on appeal.

2

Regardless, the admission of Deputy Atkins's lay opinion testimony that the Instagram photographs depicted Wilson and Fernandez was neither plain error nor abuse of discretion: It was not an error at all.

Federal Rule of Evidence 701 provides that a lay witness may testify about opinions that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701. "A lay witness may give an opinion that is based upon first-hand knowledge or observation." *United States v. Masha*, 990 F.3d 436, 445 (5th Cir. 2021). "Lay opinion testimony is admissible if it requires no great leap of logic and draws straightforward conclusions from observations informed by the witness's own experience." *Ibid.* (cleaned up).

There is nothing unusual about admitting lay opinion testimony during which the witness identifies someone in a photograph or video. "Lay witnesses who know a person . . . may testify that he is the one shown in the pictures and videotape made by surveillance cameras at banks and elsewhere. Such testimony is often useful in identifying robbers, burglars or assailants." *United States v. Ebron*, 683 F.3d 105, 137 (5th Cir. 2012) (quoting CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 7.4 (3d ed. 2003)). Indeed, the "prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the *appearance of persons* or things, *identity*, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart

from inferences." *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196 (3d Cir. 1995) (Becker, J., joined by Alito, J.) (emphasis added).

Deputy Atkins' identification of Fernandez and Wilson fits comfortably with these authorities. A specialist in apprehending fugitives, Deputy Atkins had become familiar with Wilson's and Fernandez's appearances while investigating them. And Deputy Atkins' testimony was particularly helpful to the jury because Wilson and Fernandez were wearing hats and sunglasses in the Instagram photos. *See Masha*, 990 F.3d at 446. Accordingly, we decline to vacate Wilson's conviction on this ground.

## C

Third, Wilson objects to certain statements made by the prosecutor at trial. The parties agree that we review this claim for plain error because Wilson did not object at trial to the prosecution's remarks that he now challenges. *See United States v. Johnson*, 85 F.4th 316, 319 (5th Cir. 2023) ("We review the unobjected-to remark for reversible plain error."). We (1) describe the prosecutor's statements and then (2) reject Wilson's challenges to them.

### 1

Wilson groups the allegedly improper remarks into a few categories. The first are remarks that "not only bolstered [Deputy] Atkins's identification testimony but also conveyed to the jury that the entire investigatory team had made the same identification." Blue Br. at 55. Those remarks were:

- "Clearly, the U.S. marshals know when they are looking for a fugitive, who they are looking for. It's their job." ROA.737.

- "They clearly know what Malik Fernandez looks like. He's the person they are looking for. They can see him in a picture. They can identify him." *Ibid.*

The next group of statements concerned the nature of the relationship between Wilson and Fernandez. Wilson argues that comments about his and Fernandez's apprehension in Mississippi after Wilson's arrest constitute improper "personal opinions" about whether Wilson was lying when he told Atkins he had not seen Fernandez in six years. Blue Br. at 55–56. Those statements were:

- "There is no way in the world that's a coincidence. It's not possible. It's not even physically possible for that to be true." ROA.737–38.

- "We're not buying that." ROA.722 (referring to argument that pictures could have been taken more than six years ago).

- References to Fernandez being Wilson's "buddy" or "fugitive buddy." ROA.716, 721.

Wilson argues the "buddy" comments "improperly suggest[ed] to the jury that the government had additional information that they were friends, even though no such facts were in evidence." Blue Br. at 56.

Next, Wilson argues that the prosecutors inflamed the jury in two ways. First, he points to multiple times that the prosecution referred to him as an "armed drug dealer." ROA.593 (opening statement); ROA.716–22, 732–39 (closing argument). Second, he points to two similar statements about "constitutional obligation" in the prosecution's closing arguments, one at the beginning and one at the end:

- "Well, we are here because we have a constitutional duty and obligation to uphold. You see, the government, once we charged Damion Wilson, we must then prove beyond a reasonable doubt that Damion Wilson is guilty of all six charges, and in this case, that is exactly what we did." ROA.716.

- "So, ladies and gentlemen, the evidence is what it is. It speaks for itself. And so, we are asking you today to also uphold your constitutional obligation and help us take a drug dealer, an armed drug dealer off of the street." ROA.722.

2

It is improper for prosecutors to vouch for the credibility of witnesses or express personal opinions concerning the guilt of the accused. *See United States v. Young*, 470 U.S. 1, 18 (1985). In particular, it is improper for prosecutors to make remarks during closing arguments that bolster federal agents' credibility with extra-record evidence or attack the character of the defendant. *See United States v. Bowen*, 818 F.3d 179, 191 (5th Cir. 2016). And prosecutors may not "make an appeal to passion or prejudice calculated to inflame the jury." *United States v. Raney*, 633 F.3d 385, 395 (5th Cir. 2011) (quotation omitted). Prosecutors can, of course, comment on the evidence in the case and inferences the jury should draw from it. *See United States v. McCann*, 613 F.3d 486, 495 (5th Cir. 2010). "[A] prosecutor may speak to a law enforcement witness's credibility at closing if the statement is supported by prior evidence." *United States v. Johnson*, 943 F.3d 214, 224 (5th Cir. 2019). And prosecutors are allowed "to use expressive language and a bit of oratory and hyperbole" in their closing arguments. *United States v. Garcia*, 887 F.3d 205, 210 (5th Cir. 2018) (per curiam) (quotation omitted). "[U]nflattering characterizations of a defendant will not provoke a reversal when such descriptions are supported by the evidence." *United States v. Delgado*, 672 F.3d 320, 336 (5th Cir. 2012) (en banc) (quotation omitted); *see also United States v. Windom*, 510 F.2d 989, 994 (5th Cir. 1975) (finding no error in a prosecutor's reference to a defendant as a "con artist").

When evaluating allegedly improper remarks made by the prosecution, the "determinative question is whether the remarks cast serious doubt on the correctness of the jury's verdict." *Johnson*, 85 F.4th at 319

(quotation omitted). To answer that question, "we consider the magnitude of the prejudicial effect of the prosecutor's remarks, the efficacy of any cautionary instruction by the judge, and the strength of the evidence supporting the conviction." *United States v. Thompson*, 482 F.3d 781, 785 (5th Cir. 2007) (cleaned up). "We do not lightly make the decision to overturn a criminal conviction on the basis of a prosecutor's remarks alone." *United States v. Bennett*, 874 F.3d 236, 247 (5th Cir. 2017) (quotation omitted). And we assume "that a jury can and will follow an instruction that attorneys' statements are not evidence, unless there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating." *Ibid.* (quotation omitted).

None of Wilson's contentions warrants vacatur of his conviction. The prosecutor did not discuss evidence outside the record or stray beyond permissible rhetorical flourish. True, the prosecutor referred to Wilson as an "armed drug dealer" and to Fernandez as his "fugitive buddy"—but both statements were supported by record evidence.

The only close question involves the prosecutor's admonition that the jury should "uphold [its] constitutional obligation and help us take a drug dealer, an armed drug dealer off of the street." ROA.722. But that statement did nothing "to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Young*, 470 U.S. at 16. In *Young*, for example, the prosecution exhorted the jury to "do its job" and convict the defendant. *Id.* at 18. Defense counsel then mounted a "broadside attack" on the prosecutor's comments. *Ibid.* The Supreme Court held that defense counsel's rejoinder mitigated the effect of the prosecutor's statement, and "the jury was not influenced to stray from its responsibility to be fair and unbiased." *Ibid.* In reaching that conclusion, the Court examined "the entire record," *id.* at 16, including the "overwhelming evidence" against the defendant, *id.* at 19.

No. 23-30777

So too here. Wilson's defense counsel mounted a similar broadside attack against the prosecutor's "constitutional obligation" comments, which mitigated any effect on the jury.[7] Moreover, the trial judge gave the jury *four* instructions to consider the evidence and not the lawyers' arguments. And the evidence of Wilson's guilt was overwhelming.

D

Finally, we reject Wilson's challenge to the district court's calculation of his Guidelines sentencing range. Again, our review is for plain error. *See United States v. del Carpio Frescas*, 932 F.3d 324, 332 (5th Cir. 2019) (per curiam).

Wilson contends the district court erroneously applied the cross-reference to the obstruction-of-justice Guideline (U.S.S.G. § 2J1.2) instead of applying the fraud-and-deceit Guideline (*id.* § 2B1.1) for his false-

---

[7] Defense counsel told the jury:

Wow. I think my momma raised me wrong because I was way too polite during that closing argument by the government. It is not your job to help the government do anything, and for him to say that is where we go wrong and where they want you to go wrong. I was polite, but I was outraged.

Your job is to weigh the evidence and apply the law that the judge is going to tell you it is and reach a conclusion, not to help the government get somebody convicted. That's their job. Let's see if they did their job.

ROA.722–23.

\*       \*       \*

That's a question for you to decide, not for [Deputy Atkins] to tell you, I decided that's [Wilson]. He took your job. Don't let him. It's up to you whether you want to let them take your job. It's up to you whether you want them to use you as their army to convict people. It's up to you whether or not you believe in this constitutional government that they profess. Sometimes I think it's merely professing.

ROA.730.

statement conviction under 18 U.S.C. § 1001(a)(2). Such cross-reference-based, plain-error challenges to Guidelines calculations are reminiscent of solving Fermat's Last Theorem. *See del Carpio Frescas*, 932 F.3d at 342 (Oldham, J., concurring). But we hold the district court did not reversibly err.

Start with § 2B1.1. That provision is "generally applicable to convictions under § 1001(a)(2)." *United States v. Arturo Garcia*, 590 F.3d 308, 312 (5th Cir. 2009). But "because § 1001(a)(2) prohibits the making of *any* false statement within the jurisdiction of the government, a defendant's conduct will often be more aptly covered by another guideline." *Id.* at 313 (quotation omitted). Section 2B1.1 provides that the district court should apply a different guideline when, among other criteria satisfied here, "the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct)." U.S.S.G. § 2B1.1(c)(3)(C).

Wilson's count of conviction established an offense covered by another Guideline in Chapter Two—namely, obstruction of justice in violation of 18 U.S.C. §§ 1503, 1505. Wilson's indictment charged him with "knowingly and willfully mak[ing] a false and fraudulent material statement and representation, that is, the defendant, Damion Wilson, told Deputy United States Marshal Michael Atkins that he had not seen or spoken to Malik Fernandez in six years, when, in truth and in fact, as Damion Wilson well knew, he had seen and spoken to Malik Fernandez recently." ROA.17. The evidence introduced at trial and the stipulation at sentencing gave further support to that finding. Thus, § 2B1.1(c)(3)(C) directed the district court to apply the obstruction-of-justice Guideline.

The obstruction-of-justice Guideline is § 2J1.2. True, as Wilson argues, his offense did not fall under § 2J1.2(b)(1) because it did not involve

No. 23-30777

sex offenses or terrorism.[8] But § 2J1.2(b)(2) applies when an "offense resulted in substantial interference with the administration of justice," which Wilson's conduct did. Given the "wide latitude" afforded to district courts "to consider information that may be relevant to sentencing," this was a permissible decision. *United States v. Chiasson*, 90 F.4th 832, 836 (5th Cir. 2024).

And even if that was error, it was not *plain* error, because no on-point, binding precedent of this court or the Supreme Court forbids a district court from applying § 2J1.2 in these circumstances.[9] "Arguments that require the extension of existing precedent cannot meet the plain error standard." *United States v. Jones*, 88 F.4th 571, 574 (5th Cir. 2023) (per curiam), *cert. denied*, 144 S. Ct. 1081 (2024). So at a minimum, Wilson has not shown plain error.

\*    \*    \*

AFFIRMED.

---

[8] An unpublished per curiam decision once suggested that § 2J1.2 applies to a § 1001 violation only if the statutory maximum is eight years (due to sex offenses or terrorism being involved). *See United States v. Hatley*, 717 F. App'x 457, 463 (5th Cir. 2018) (per curiam) (unpublished). Of course, that is not precedential. It is also inapplicable, because § 2B1.1(c)(3) pushes obstructive conduct like Wilson's into § 2J1.2 regardless of whether the matter involved sex offenses or terrorism. *See* U.S.S.G. § 2J1.2(a), (b)(2), (3).

[9] Contrary to the dissent's characterization of our precedent, the Fifth Circuit has not addressed whether a district court may consider trial evidence in determining whether to apply the cross-reference. *See United States v. Arturo Garcia*, 590 F.3d 308, 315 (5th Cir. 2009) (sentencing following a guilty plea); *United States v. Griego*, 837 F.3d 520 (5th Cir. 2016) (same). Without a clear decision from the Supreme Court or this court, there can be no plain error.

No. 23-30777

James E. Graves, Jr., *Circuit Judge*, concurring in part and dissenting in part:

The majority correctly rejects Wilson's challenges to his conviction. However, I write separately to (1) express that I neither adopt nor join the majority's protracted discussion regarding whether a *Terry* stop may be premised solely on the defendant carrying a firearm and (2) dissent from the majority's decision to affirm Wilson's sentence.

**I.**

Under *Terry v. Ohio*[1] and our precedent, a stop is justified if officers have reasonable suspicion that crime is afoot "tak[ing] into account the totality of the circumstances." *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022) (citation omitted); *see also United States v. Pack*, 612 F.3d 341, 355 (5th Cir. 2010). It is an "objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 392 U.S. at 21-22 (citation omitted).

As the majority explains, the officers had reasonable suspicion to stop Wilson because of specific and articulable facts that crime was afoot— separate and apart from the fact that Wilson was carrying a firearm. There were facts, known to the officers, that supported a reasonable belief that Wilson was engaged in harboring a federal fugitive or drug trafficking.

Despite recognizing that there were sufficient facts justifying the *Terry* stop, the majority spends more than ten pages recounting the history and tradition of searches and seizures to explain why a *Terry* stop could not be based solely on the fact that a person is carrying a firearm. Here, the *Terry*

_____

[1] 392 U.S. 1 (1968).

stop was not based solely on the fact that Wilson was carrying a firearm. Respectfully, the history is superfluous and unhelpful to the disposition of this case.

## II.

The majority concludes by finding that the district court did not plainly err in applying the obstruction-of-justice Guideline (U.S.S.G. § 2J1.2) through the cross reference within the fraud-and-deceit Guideline (*id.* § 2B1.1(c)(3)) for Wilson's false-statement conviction under 18 U.S.C. § 1001(a)(2). In doing so, the majority contravenes the rule of orderliness. *See Mercado v. Lynch*, 823 F.3d 276, 279 (5th Cir. 2016) (per curiam) ("Under our rule of orderliness, 'one panel of our court may not overturn another panel′s decision, absent an intervening change in the law.'" (citation omitted)).

Because Wilson was convicted for an offense under 18 U.S.C. § 1001(a)(2), generally the applicable Guideline provision would be U.S.S.G. § 2B1.1 (fraud-and-deceit). However, Section 2B1.1(c)(3) directs a district court to apply a different Guideline when, among other requirements, "the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct)." The district court seemingly used this cross-reference to apply the obstruction-of-justice Guideline (U.S.S.G. § 2J1.2) pursuant to 18 U.S.C. §§ 1503, 1505—a decision to which Wilson did not contemporaneously object and which is subject to plain-error review.

Under plain-error review, "reversal is not required unless there is (1) an error; (2) that is clear or plain; (3) that affects the defendant's substantial rights; and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Vasquez*, 216 F.3d 456, 459 (5th Cir.), *cert. denied*, 531 U.S. 972 (2000). There is no plain error if the

"substantive legal question . . . was unsettled at the time the trial court acted." *United States v. Harris*, 740 F.3d 956, 966 (5th Cir. 2014) (citation omitted).

The district court clearly and plainly erred in applying Section 2J1.2 as a cross-reference provision pursuant to Section 2B1.1(c)(3). *See United States v. Arturo Garcia*, 590 F.3d 308, 315 (5th Cir. 2009); *United States v. Griego*, 837 F.3d 520, 522-23 (5th Cir. 2016). In *Arturo Garcia*, this Court dealt with an issue of first impression in our circuit: "under what circumstances a district court may apply a cross-reference provision pursuant to U.S.S.G. § 2B1.1(c)(3)." 590 F.3d at 312. There, the defendant pleaded guilty to making a false statement under 18 U.S.C. § 1001(a)(2) and argued that the district court erred by using Section 2B1.1(c)(3) to apply the U.S.S.G § 2L1.1 Guideline, which covers "Smuggling, Transporting, or Harboring an Unlawful Alien." *Id.* at 311-13. The Court stated that it "f[ound] persuasive the reasoning of several other circuits, which after considering this same issue, have held that a sentencing court may apply a cross-reference provision under U.S.S.G. § 2B1.1(c)(3) *only if* the application of that provision is supported by the conduct alleged in the indictment." *Id.* at 315 (emphasis added). Applying that rule, the Court concluded that the district court did not err when it used Section 2L1.1 to determine the defendant's base offense because one criminal statute that applies to that provision is 8 U.S.C. § 1185(a)(2) and the "'count of conviction'—Count 1 of the one-count indictment" covered conduct under that statute. *Id.* at 316.

The Court built upon the *Arturo Garcia* rule in *Griego*. There, the defendant pleaded guilty to an offense under 18 U.S.C. § 1001(a)(2), and similar to the case at bar, the district court found the relevant Guideline to be Section 2J1.2 pursuant to the Section 2B1.1(c)(3) cross-reference. *Griego*, 837 F.3d at 521-22. The government argued that the defendant's conduct satisfied 18 U.S.C. § 1505 ("Obstruction of proceedings before departments,

agencies, and committees"). *Id.* at 522. The Court concluded that applying the cross-reference was a significant procedural error, affirming that "a district court may apply a cross-reference provision pursuant to § 2B1.1(c)(3) only if the facts alleged in the indictment establish the elements of another offense for which the other guideline is applicable." *Id.* at 522 (citing *Arturo Garcia*, 590 F.3d at 315-16). The Court explained that the defendant's indictment alleged that he "did knowingly and willfully make a false, fraudulent and fictitious material statement and representation," which satisfied the "generalized mens rea" of 18 U.S.C. § 1001. *Id.* at 523. However, offenses under 18 U.S.C. § 1505 require proof that the defendant acted "'corruptly'[,] . . . with the specific intent to subvert or undermine the due administration of justice." *Id.* Because the defendant's indictment did not sufficiently allege the more specific mens rea required to violate 18 U.S.C. § 1505, the district court erred in applying Section 2J1.2. *Id.*

Here, Wilson's indictment states: "[Wilson] did knowingly and willfully make a false and fraudulent material statement and representation, that is, the defendant DAMION WILSON, told Deputy United States Marshal Michael Atkins that he had not seen or spoken to Malik Fernandez in six years, when in truth and in fact, as DAMION WILSON well knew, he had seen and spoken to Malik Fernandez recently, in violation of Title 18, United States Code, Section 1001." This language is virtually identical to the language in *Griego*, which was insufficient to establish the mens rea required for a conviction under 18 U.S.C. § 1505. *See Griego*, 837 F.3d at 523. Moreover, 18 U.S.C. § 1503 similarly requires the defendant to have "acted corruptly with the specific intent to influence, obstruct, or impede th[e] judicial proceeding in its due administration of justice." *United States v. Richardson*, 676 F.3d 491, 502 (5th Cir. 2012). So the indictment also does not support a conviction under 18 U.S.C. § 1503.

The majority attempts to distinguish these precedents by reasoning that they involved plea agreements, while here the district court had also had trial evidence and an additional stipulation at sentencing before it. Citing *United States v. Chiasson*,[2] the majority finds that the district court had "wide latitude" to consider all this information and find that Wilson's offense met the standard for obstruction. This reasoning is flawed.[3]

For one, *Chiasson* was not a case involving application of the Section 2B1.1(c)(3) cross-reference, and it certainly did not purport to abrogate *Griego* or *Arturo Garcia*. *See Chiasson*, 90 F.4th at 836. And in *Arturo Garcia*, there was more information before the Court than just the indictment. The district court also had before it a stipulated factual basis document, as is often the case when a district court accepts a plea. *Arturo Garcia*, 590 F.3d at 311. Yet, the Court still held that the Section 2B1.1(c)(3) cross-reference was only appropriate if the facts alleged in the *indictment* established the elements of another offense. *Id.* at 315.

Moreover, the Court in *Arturo Garcia* explicitly "adopt[ed] the reasoning of . . . other circuits" that have required the indictment to allege the conduct necessary to apply a cross-reference provision pursuant to Section 2B1.1(c)(3). *Id.* at 315. *Arturo Garcia* specifically cited *United States v. Genao*, 343 F.3d 578 (2d Cir. 2003); *United States v. Bah*, 439 F.3d 423 (8th Cir. 2006); and *United States v. Kim*, 95 F. App'x 857 (9th Cir. 2004). *See Arturo Garcia*, 590 F.3d at 315 n.15. Notably, in *Bah*, where the defendant pleaded guilty, the Eighth Circuit explained that while an agent's testimony at the sentencing hearing might have established a more serious offense than

---

[2] 90 F.4th 832, 836 (5th Cir. 2024).

[3] The majority also curiously suggests that the district court applied Section 2J1.2(b)(2). But that subsection applies an enhancement for specific characteristics of obstruction of justice offenses, which the district court indisputably did not apply.

No. 23-30777

18 U.S.C. § 1001, the conduct alleged in the indictment did not establish such an offense and so the Section 2B1.1(c)(3) cross-reference was not applicable. *Bah*, 439 F.3d at 428. Further, in *Kim*, the defendant had been convicted after a jury trial, but the Ninth Circuit explained: "Whether or not the government proved the heightened mens rea at trial is immaterial; under the terms of the cross-referenced provision, the statutory element had to be established by the allegations of the indictment." *Kim*, 95 F. App'x at 862.

The reason for this focus on the indictment, i.e. interpreting Section 2B1.1(c)(3)'s reference to "count of conviction" to mean the indictment, is because the prior Guideline provision contained "substantially broader language." *Genao*, 343 F.3d at 583. As explained by the Eighth Circuit:

> Under the prior version of the guidelines, sentencing for a violation of § 1001 was governed by the former § 2F1.1, which contained a similar cross-reference provision that allowed the district court to consider not only the indictment or information setting forth the count of conviction but also "(a stipulation described in § 1B1.2(a))." U.S.S.G. § 2F1.1 (deleted), cmt. n. 14 (1998). However, when § 2F1.1 and § 2B1.1 were consolidated, this parenthetical phrase in § 2F1.1 was not adopted. Clearly, the Sentencing Commission intended to limit the application of the cross-reference to situations in which the conduct set forth solely in the count of conviction establishes another offense.

*Bah*, 439 F.3d at n.3.[4]

---

[4] The prior Guideline version further allowed a cross-reference when the indictment "establishe[d] an offense *more aptly covered* by another guideline." *Genao*, 343 F.3d at 583 (quoting U.S.S.G. § 2F1.1 (deleted, cmt., n. 14 (1998) (emphasis added)). In contrast Section 2B1.1(c)(3) more narrowly requires "the count of conviction *specifically cover*[] . . . another guideline." (emphasis added); *see generally Genao*, 343 F.3d at 584 n.8.

34

The Court's reliance in *Arturo Garcia* on the reasoning of these out-of-circuit cases is further evidence that it meant what it said: "a sentencing court may apply a cross-reference provision under U.S.S.G. § 2B1.1(c)(3) only if the application of that provision is supported by the conduct alleged in the indictment." *Arturo Garcia*, 590 F.3d at 315; *see Griego*, 837 F.3d at 522. Application of the cross-reference was plain or obvious error.

Additionally, application of the Section 2J1.2 cross-referencing provision affected Wilson's substantial rights because he was sentenced at the top of the Guidelines range (81 to 87 months) to 87 months. Had the district court applied the correct Guideline, his sentencing range would have been 72 to 78 months. *See* U.S.S.G. Ch.5, Pt. A. "Absent unusual circumstances," such as if the sentencing judge explained in detail how he "based the sentence on factors independent of the Guidelines," the defendant "need only 'point to the application of an incorrect, higher Guidelines range and the sentence thereunder' to demonstrate" an effect on his substantial rights." *United States v. Parra*, 111 F.4th 651, 661 (5th Cir. 2024) (citations omitted) (cleaned up). As the sentencing judge did not so explain and Wilson's sentence was erroneously increased by at least nine months, Wilson has established an effect on his substantial rights. *See Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016) ("In most cases a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome."). This error warrants an exercise of the Court's discretion to correct. *See Rosales-Mireles v. United States*, 585 U.S. 129, 140 (2018) ("The risk of unnecessary deprivation of liberty particularly undermines the fairness, integrity, or public reputation of judicial proceedings."); *see also United States v. Marroquin*, 884 F.3d 298, 301 (5th Cir. 2018) (exercising discretion to correct a sentencing error that imposed a sentence four months above the correct guidelines range).

No. 23-30777

For these reasons, I respectfully dissent in part.